RENDERED: DECEMBER 17, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0241-MR

RONALD EXANTUS                                           APPELLANT

                 ON APPEAL FROM WOODFORD CIRCUIT COURT
V.                  HON. PHILLIP R. PATTON, SPECIAL JUDGE
                              NO. 15-CR-00090

COMMONWEALTH OF KENTUCKY                       APPELLEE

## OPINION OF THE COURT BY JUSTICE LAMBERT

## <u>AFFIRMING</u>

Ronald Exantus was found not guilty by reason of insanity of one count of murder, not guilty by reason of insanity of one count of first-degree burglary, guilty but mentally ill of two counts of second-degree assault, and guilty but mentally ill of one count of fourth-degree assault. He now appeals his resulting twenty-year sentence to this Court as a matter of right.[1] After review, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Exantus was a thirty-two-year-old dialysis nurse from Indianapolis, Indiana. He worked with dialysis patients for ten years with the same

---

[1] Ky. Const. § 110(2)(b).

company, first as a technician and later as a registered nurse. His coworkers and supervisors described him without exception as an exemplary, dependable, and trustworthy employee. He had no previous criminal convictions, though it was undisputed that he smoked marijuana regularly. He had no documented history of mental illness.

The series of events that led to the tragic outcome of this case began to unfold in the first week of December 2015. During that week Exantus' girlfriend of three years, Lauren, began noticing that he was exhibiting odd behavior. She testified that she first noticed on Monday or Tuesday of that week that he was not sleeping as much as he normally did. Lauren, as well as her parents Will and Lisa, noticed that Exantus also was not eating much. This was highly unusual as Exantus, a former semiprofessional linebacker, is a man of large stature and was known to eat a lot. He also began having crying spells. Both Lauren and Lisa testified that these crying spells were the first time either of them saw him cry. His coworkers also noted unusual behavior that week. He was very "giddy and bubbly" at work, when ordinarily he was very serious and grounded. He was also speaking at a much louder volume than normal. One coworker stated he discussed his personal life with her, which he had not done in the ten years she worked with him. Another said he put his arm around her during a conversation. This was notable to her as he, historically, was not someone who showed affection to others in that way.

All of this uncharacteristic behavior came to a head on Sunday, December 6th. Exantus cried the whole time he and Lauren were getting

dressed for church that morning, but he could not articulate what was wrong. Towards the end of the church service, he began crying again and asked to speak to Lauren's mother. Lisa testified she and Exantus went outside to the church parking lot. She tried to talk to him, but he was rambling and saying things that did not make sense to her. At one point he dropped to the ground and started crying again. Eventually she was able to calm him down and they went back inside the church.

Not long after Exantus was back inside he started causing a commotion in the back of the sanctuary, so Will and a pastor took Exantus back outside to the parking lot. Will testified Exantus was babbling and saying things that did not make sense. The pastor, who met Exantus for the first time that day, testified that Exantus was very animated while he was talking. He further attested that he gathered that Exantus was asking him spiritual questions, but his words were out of order. Exantus did not seem to realize that his words were not coherent. The pastor also stated Exantus' emotions went from joy, to sorrow, and back to joy within a five to eight-minute period. He fell to the ground and cried in front of them as well.

Ultimately, they went back into the church and sat with the rest of Lauren's family. Exantus then began pointing at people and saying they were police officers and investigators. Soon after that, he got on one knee and proposed to Lauren while sobbing hysterically. Lauren stated this was completely unexpected, and she rushed him to get off the floor because it embarrassed her.

Later that afternoon Lauren and Exantus went shopping for an engagement ring, as he did not have one when he proposed. The woman working at the jewelry store testified they were in the store for about an hour. She said they were both very happy and she did not notice anything unusual about Exantus' behavior, though she had never met him before.

That evening they went to dinner with Lauren's family. Exantus started crying again during dinner and asked Will to go outside with him two different times. Will said when he was outside with him, Exantus was crying and started saying things about his patients and that he was sorry for something that happened at work. Will asked him what happened but Exantus would not tell him. Will was able to get him to calm down and go back inside the restaurant, but Exantus did not eat the food he ordered.

When Lauren and Exantus got home from dinner they began looking at items for their wedding. Lauren had him take NyQuil because she thought his behavior would return to normal if he got some sleep. Instead of going to sleep he suddenly got out of bed and told her he did not want to marry her or be with her. He also said that he was not going to hurt her, but he had to go. Lauren testified that he said all of this with a calm, flat affect and, though his words were directed at her, he was not looking at her when he said them. According to Lauren, he left their home between 8:30 and 9:00 p.m. He took his personal cell phone, but not his work cellphone despite the fact that he was on call. Lauren said she tried calling and texting him several times after he left, but he never answered or responded.

4

The evidence presented at trial suggested Exantus was planning to drive from Indiana to Florida where his family lived. Instead, he ended up in a neighborhood in Versailles, Kentucky, a place he had never been before. Exantus would later tell investigators that he saw a street sign that said either "Grey's Street" or "Grey's Road."[2] He said the sign made him think of the television show "Grey's Anatomy," which in turn made him believe he needed to perform surgery. The house he chose to enter was the home of the Tipton family. He said he selected the home because of the Christmas lights on the outside.

The members of the Tipton family living in the home at that time were a married couple, Dean and Heather, and their five children: K.T.[3] (11 years old), L.T. (9 years old), D.T. (7 years old), Logan (6 years old), and A.T.[4] The home had two stories: Dean and Heather's bedroom was downstairs, and all of the children slept in a bedroom on the second floor. Heather was working a night shift when the following events took place, but Dean and all five children were home.

Shortly before 4 a.m. on December 7th, Exantus entered the home through the unlocked front door.[5] He went into the kitchen on the first floor of

---

[2] The evidence was conflicting on the actual name of the street.

[3] The surviving children in this case are referred to by their initials to protect their privacy.

[4] A.T. is the youngest, however his or her exact age was not provided.

[5] The week prior, Logan accidentally broke Heather's house key off in the backdoor of the home. Therefore, Dean left the front door unlocked so Heather could get in when she returned from work without waking the other members of the family.

the home and got a butcher knife and a butter knife. He then went upstairs to the children's bedroom. He entered the bedroom and stabbed Logan in the back of the head with the butcher knife eight times. The oldest child, K.T., testified that she awoke to the sound of Logan screaming. When she realized what was happening, K.T. yelled at Exantus to stop and kicked him. Exantus then turned to K.T. and came at her with the butter knife. She grabbed the knife out of his hand. Exantus asked for the knife back and K.T. gave it to him. Exantus then ran the butter knife up her stomach and cut her nose with it.

By that point, L.T. had gone downstairs to get Dean. When Dean reached the top of the stairs, Exantus came at him with the butcher knife raised and a struggle ensued. Dean was able to get the knife away from Exantus, but Dean's pre-existing shoulder injury was re-injured during the fight. Dean told K.T. to go downstairs and call the police. All of the children except for Logan went downstairs with her, and she called 911. The police arrived shortly after and placed Exantus under arrest. The paramedics arrived thereafter and attempted to save Logan's life but were unable to do so. It was later discovered that Exantus also cut D.T.'s back at some point during the chaos.

At trial, the Commonwealth sought the death penalty. Its theory of the case was that Exantus smoked or otherwise took some illegal substance which caused him to commit these crimes. The defense conceded that Exantus committed the acts and instead focused its case on proving that he was legally

6

insane when he committed them.  The defense adamantly denied that Exantus'

mental state during the crimes was caused by any kind of drug, illegal or

otherwise.

Forensic toxicologists from the Kentucky State Police laboratory and a

private lab hired by the defense tested blood samples taken from Exantus

shortly after his arrest.  Jason Berry, a forensic scientist with the Kentucky

State Police, tested Exantus' blood for the presence of drugs.  His test results

showed the presence of THC, the psychoactive ingredient in marijuana.

However, he stated with certainty that the compound was inactive at the time

Exantus' blood sample was drawn and was therefore not having an active effect

on him.  The defense's private lab found only doxylamine, a metabolite found in

NyQuil and other sleep aids, in Exantus' blood sample.  Nothing else was

found, though both witnesses acknowledged that new drugs are being created

continually, and it was possible that drugs existed which the labs did not yet

test for.  Additionally, less than a gram of marijuana was found loose in the

floorboard of Exantus' vehicle.  That marijuana was tested by the Kentucky

State Police crime lab, and their tests concluded it was not laced with any of

the substances they test for – PCP, MDMA, etc.

The sole mental health expert to testify in the case was Dr. Kenneth

Benedict, a clinical psychologist retained by the defense.  He testified that in

his expert opinion Exantus suffered from a major mental illness marked by the

presence of mania and psychosis.  He further opined that during the

commission of these crimes Exantus was legally insane.  He could not provide

7

a concrete diagnosis, but believed Exantus was suffering from either schizophrenia, schizoaffective disorder, bipolar disorder with psychosis, or major depressive disorder with psychosis.

Based on the foregoing evidence, the jury found Exantus not guilty by reason of insanity for the first-degree murder of Logan, and not guilty by reason of insanity of the first-degree burglary of the home. He was found guilty but mentally ill of the second-degree assaults of K.T. and D.T., and guilty but mentally ill of the fourth-degree assault of Dean.

Additional facts are discussed below as necessary.

## I. ANALYSIS

Exantus presents several arguments to this Court. To wit: (1) that the jury's verdicts were impermissibly inconsistent; (2) that the trial court erred by failing to grant his motions for directed verdict; (3) that the trial court erred by failing to provide lesser-included offense instructions to the jury; (4) that the jury instructions failed to define the term "dangerous instrument"; (5) that the trial court erred by denying his motion to strike three jurors for cause; and (6) that the trial court erred by admitting evidence of a prior bad act. We now address each issue in turn.

## A. The jury's verdicts were not impermissibly inconsistent.

As previously stated, Exantus was found not guilty by reason of insanity of first-degree murder and burglary and was also found guilty but mentally ill of three assaults. A component of Exantus' directed verdict argument is that

the jury's verdicts were impermissibly inconsistent.[6] But, as this issue is a matter of first impression for this Court, we believe it warrants separate discussion.

This Court has never had occasion to review a case in which the jury returned verdicts of both insanity and guilty but mentally ill. Although our case law regarding verdicts that require inconsistent mental states is well-established, this issue is novel because a verdict of insanity goes directly to a defendant's culpability: it completely absolves a defendant of all criminal responsibility for his acts.[7] Yet a verdict of guilty but mentally ill allows a defendant to be held responsible for his acts[8] because, though mentally ill, he is still able to appreciate the criminality of his conduct and conform his behavior to the requirements of law.[9] And therein, as Exantus' argument goes, lies the rub.

In that vein, Exantus' argument here is twofold. First, he asserts that there was no evidence that his mental state shifted from insanity to guilty but mentally ill in the short time between the burglary and murder and the three assaults. He further advocates for an exception to our inconsistent verdict rule. That exception would require that, if a jury finds a defendant not guilty

---

[6] This argument was properly preserved for our review by Exantus' post-trial motion for judgment notwithstanding the verdict. Kentucky Rule of Criminal Procedure (RCr) 10.24.

[7] *See* Kentucky Revised Statute (KRS) 504.020(1).

[8] *See* KRS 504.150(1).

[9] *Compare* KRS 504.060(5) *with* KRS 504.060(6).

9

by reason of insanity on at least one count of a multiple count indictment, it must find him not guilty by reason of insanity on all counts arising from the same criminal episode.

For the reasons that follow, we do not believe an exception to the rule regarding inconsistent verdicts is warranted. We accordingly hold that a verdict finding a defendant both not guilty by reason of insanity and guilty but mentally ill is permissible as long as there was sufficient evidence to support the jury's finding of guilty but mentally ill on a particular count.[10] We further hold that there was sufficient evidence supported the jury's verdict of guilty but mentally ill on the three counts of assault in this case.

The seminal case on inconsistent verdicts in Kentucky is *Commonwealth v. Harrell*.[11] In *Harrell*, the defendant was driving under the influence while doing twice the speed limit when he drove through a stop sign and collided with another car.[12] The defendant was convicted for the second degree assault of the driver of the other vehicle, who was seriously injured, and of the reckless homicide of the passenger of the other vehicle, who died.[13] The defendant argued before the Court of Appeals that the mental states required for those crimes were logically inconsistent: reckless homicide required a mental state of

---

[10] We note that, while not at issue in this case, the same rule and reasoning would apply if the jury found the defendant not guilty by reason of insanity and guilty instead of guilty but mentally ill.

[11] 3 S.W.3d 349 (Ky. 1999).

[12] *Id*. at 349-50.

[13] *Id*.

recklessness, while second-degree assault required a mental state of wantonness.[14]  The Court of Appeals agreed and reversed his conviction under *Pace v. Commonwealth*,[15] which held that "where injury simultaneously occurs to more than one victim; it is logically inconsistent for the jury to convict the defendant of crimes requiring different criminal culpabilities as to those parties."[16]

This Court subsequently reversed the Court of Appeals, overruled *Pace*, and affirmed the defendant's convictions.[17]  The *Harrell* Court held that *Pace* "focused erroneously on the concept of consistency rather than upon the concept of sufficiency of evidence to sustain each conviction," and that "a defendant may have a reckless state of mind with respect to one result and a wanton state of mind with respect to another result arising simultaneously from the same conduct."[18]  In reaching this conclusion, the Court reasoned that a

> rigid adherence to a prohibition against inconsistent
> verdicts may interfere with the proper function of a
> jury, particularly with regard to lenity.  Such an
> approach would unduly restrict the right of the jury to
> consider the evidence broadly and convict or acquit
> based upon its view of the evidence pertaining to each
> charge.  Moreover, that approach requires analytical

---

[14] *Id.* at 350.

[15] 636 S.W.2d 887 (Ky. 1982), *overruled by Commonwealth v. Harrell*, 3 S.W.3d 349 (Ky. 1999).

[16] *Harrell*, 3 S.W.3d at 351 (quoting *Commonwealth v. Runion*, 873 S.W.2d 583, 587 (Ky. App. 1993), *disapproved of by Commonwealth v. Harrell*, 3 S.W.3d 349 (Ky. 1999)).

[17] *Id.*

[18] *Id.*

11

precision that would inevitably lead to confusion and needless appellate reversals.[19]

Instead, this Court believed the better approach was to consider each count of an indictment as its own stand-alone indictment.[20] Consistent verdicts would therefore not be required because the only inquiry on review would be whether there was sufficient evidence to support an individual conviction.[21] This Court further noted that this approach was consistent with the United States Supreme Court's holding in *United States v. Powell*, 469 U.S. 57, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984).[22] *Powell*, in turn, provides a more thorough discussion of the rationales behind the rule allowing inconsistent verdicts. As we believe the wisdom of *Powell* applies to the case at bar, we now recount some of it briefly.

In *Powell*, the Supreme Court readily acknowledged that inconsistent verdicts "present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred."[23] But inconsistent verdicts should not necessarily be considered "a windfall to the government at the defendant's expense," because it is impossible to know which party the inconsistent verdict benefitted.[24] In other words, it is entirely

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Powell*, 469 U.S. at 65.

[24] *Id.*

possible that in any given case the jury believed the defendant was guilty of a greater offense in a multiple count indictment, but "through mistake, compromise, or lenity," decided to acquit the defendant of the greater offense and convict him of the lesser offense.[25]  There is simply no way to know "whose ox has been gored."[26]  Thus, "the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest."[27]  Finally, the Court noted that defendants are already protected "from jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."[28]

We can discern no reason to deviate from the approaches of *Harrell* and *Powell* when addressing cases that involve a finding of not guilty by reason of insanity and guilty but mentally ill.  As the *Powell* Court discussed, the only party that bears the burden of a jury's exercise of lenity is the Government, as it is unable to appeal a verdict of acquittal[29]  or its functional equivalent of insanity. And while jury nullification is without question problematic, "such an alternative should be available for the difficult cases where the jury wishes to avoid an all-or-nothing verdict."[30]

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.* at 67.

[29] *Id.* at 66.

[30] *Id.*

13

The case now before us is nothing if not difficult. This Court strongly suspects that the verdicts in this case were reached because the jury could not reach either of the all-or-nothing verdicts advocated for by the parties. The defense urged the jury to find Exantus not guilty by reason of insanity on all counts, while the Commonwealth argued that the jury had to find him guilty on all counts. Neither party directly advocated for a verdict of guilty but mentally ill on any count. It is therefore possible that the jury reached its verdicts through compromise and the exercise of lenity. But, as with any case, determining exactly how the jury reached its verdict would require peaking behind a curtain that is nearly always off limits to the prying eyes of an appellate court. Therefore, an "individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake."[31] For all of the foregoing reasons, we simply cannot hold that an exception to this steadfast rule should be made when a verdict of not guilty by reason of insanity is involved.[32]

Accordingly, we need only apply the *Harrell* test to resolve this issue. That test simply asks whether there was sufficient evidence to find Exantus guilty but mentally ill of the three assaults. This issue was raised by Exantus' post-trial motion for judgment notwithstanding the verdict. We therefore apply

---

[31] *Id.*

[32] Finally, we note that this approach is consistent with the conclusion of the only other state supreme court that has addressed this issue. *See Milam v. State*, 341 S.E.2d 216 (Ga. 1986).

the same standard of review as we would for review of a trial court's denial of a motion for directed verdict.[33] Accordingly, the evidence was insufficient only "if under the evidence as a whole, it would be clearly unreasonable for a jury to find" Exantus guilty but mentally ill of the three assaults.[34] As Exantus only argues that the mental states were inconsistent, we will not address sufficiency of evidence for the actus reus elements for those crimes here.

Regarding the evidence of Exantus' mental state, what was perhaps one of the more important pieces of evidence came from Dr. Benedict. As previously mentioned, Dr. Benedict was the defense's expert and was the only mental health expert to testify at trial. Dr. Benedict testified that it was his opinion that Exantus was legally insane during the commission of his crimes and noted the presence of both psychosis and mania in particular. Towards the end of Dr. Benedict's direct examination defense counsel asked him if it was possible for psychosis to wax and wane over time. To this, Dr. Benedict replied, "yes. Symptoms of psychosis, even during an active phase when the symptoms are relatively prominent and in play a lot, do wax and wane on a daily basis, on an hourly basis, even within a thirty-minute interview you see the waxing and waning of certain symptoms." This testimony, coupled with the fact that psychosis and mania do not necessarily equate to legal insanity, provided the jury with a basis to find that Exantus' mental state could have

---

[33] *Capshaw v. Commonwealth*, 253 S.W.3d 557, 562 (Ky. App. 2007) (citing *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256 (Ky. App. 2007)).

[34] *See Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

15

shifted from insanity to guilty but mentally ill during the short period of time in question. Or, in other words, the jury could have reasonably believed that Exantus was having intervals of lucidity during the commission of his crimes.

In addition, several other pieces of evidence suggested that, while Exantus was almost certainly suffering from some kind of mental illness, he could still appreciate the criminality of his conduct. For example, while Dean and Exantus were fighting, Dean told Exantus he was going to kill him and Exantus begged him not to kill him. Additionally, Officer Scott Cottingham testified that the responding officers had to taser Exantus three times before they were able to handcuff him. In fairness, this piece of evidence could cut both ways. But it would not be unreasonable for a juror to believe that Exantus was attempting to escape, which is permissible as evidence of a guilty conscience.[35] Ofc. Cottingham also testified that Officer Johnathan Guiler began doing first aid on Logan before the paramedics arrived. Ofc. Cottingham heard Exantus ask if Ofc. Guiler was doing chest compressions and also heard Exantus say "he's not doing the right number he should be doing 30 compressions." All of the officers that responded to the scene testified to hearing Exantus say he was sorry several times.

Less than an hour after Exantus was arrested, he was interviewed by Detective Keith Ford and Ofc. Guiler. Det. Ford testified that Exantus did not appear to be under the influence of alcohol or drugs during the interview and

---

[35] *See, e.g., Commonwealth v. Bowles*, 237 S.W.3d 137, 140 (Ky. 2007).

16

was "lucid and candid" when answering questions. Exantus accurately told the officers information such as his name, date of birth, social security number, home address, phone number, and occupation, and gave them an accurate description of his vehicle and where he left it. Exantus knew that he was in Versailles, Kentucky, and that he originally intended to drive to Florida to see family members that lived there. He told the officers he entered the home through an unlocked door and his description of the home was consistent with the photographic evidence. Exantus told the officers he walked to the kitchen and got a knife. He knew that he stabbed a child in the head with the knife, and that he killed that child. Exantus also knew that the father of that child put him in a chokehold, and he understood why the father was angry with him. Finally, he told the officers that someone who stabs a child in the head should "go to jail" and "should be punished." Finally, when Det. Ford asked Exantus what his fiancé would think about what he did, he replied "she's not going to like it, sir."

Based on the foregoing, it was not clearly unreasonable for the jury to find the requisite mental state to return a verdict of guilty but mentally ill of the second-degree assaults of K.T. and D.T. and the fourth-degree assault of Dean. We accordingly affirm.

## B. The trial court did not err by denying Exantus' motions for directed verdict.

Exantus next argues that the trial court erred by denying his motions for directed verdict for the assaults of K.T., D.T., and Dean. The standard of review for denial of a motion for directed verdict is as follows:

17

On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[36]

With these rules in mind we now address each argument in turn.

### i.) Second-degree assault of K.T.

Exantus was convicted under the theory of second-degree assault that required him to intentionally cause physical injury to K.T. with a dangerous instrument.[37] He asserts that the trial erred by failing to grant his motion for directed verdict for two reasons.[38] One, because the Commonwealth failed to prove that K.T. suffered a physical injury; and two, because a butter knife does not constitute a dangerous instrument.

These arguments were properly preserved for our review by defense counsel's motions for directed verdict at the close of the Commonwealth's evidence and at the close of all the evidence.[39] Those motions asserted that the

---

[36] *Benham*, 816 S.W.2d at 187–88.

[37] KRS 508.020(1)(b).

[38] Exantus also argues that the Commonwealth failed to prove he acted intentionally. But, as we have already addressed the sufficiency of the mens rea evidence in Section II(A), we see no reason to discuss it again here. In addition, Exantus asserts that the jury was not instructed on the definition of a "dangerous instrument." But because we address this argument in Section II(D) as a standalone issue, we will not address it as part of his directed verdict argument.

[39] *See, e.g.*, *Early v. Commonwealth*, 470 S.W.3d 729, 733 (Ky. 2015).

Commonwealth failed to meet its burden of proof on the second-degree assault charge in relation to K.T. and identified the elements of second-degree assault the Commonwealth failed to prove as recounted above.[40]

Exantus first contends that there was insufficient evidence that K.T. suffered a physical injury. As part of his argument, he contends that this Court should overrule *Meredith v. Commonwealth* and its corresponding interpretation of the term "physical injury" to mean any injury.[41] We will address his arguments in reverse order.

In *Meredith*, the defendant thrust a hunting knife at the victim during a scuffle.[42] The victim grabbed the knife to disarm the defendant and suffered a "superficial wound to his left hand from the knife."[43] The defendant was consequently convicted of second-degree assault under the theory that he intentionally caused physical injury to the victim by use of a deadly weapon or dangerous instrument.[44]

At the Court of Appeals the defendant argued that the superficial wound to the victim's hand did not meet the statutory definition of physical injury.[45] To address this issue the Court of Appeals began by outlining the statutory definition of physical injury, which is either "substantial physical pain or any

---

[40] CR 50.01 ("A motion for a directed verdict shall state the specific grounds therefor.").

[41] 628 S.W.2d 887, 888 (Ky. App. 1982).

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

19

impairment of physical condition."[46]  But, because the evidence did not suggest

that the victim suffered "substantial physical pain," the Court was left to

interpret the meaning of "any impairment of physical condition."[47]  To do this,

the Court of Appeals primarily compared the statutory definition of "serious

physical injury" to that of "physical injury."  On that front, it opined:

> The definition of "serious physical injury," as it
> pertains to the impairment necessary to constitute
> such injury, in KRS 500.080(15) speaks of "prolonged
> impairment of health, or prolonged...impairment of the
> function of any bodily organ."  Contrasting this
> "prolonged impairment of health" with "any
> impairment of physical condition," we feel that the
> color of the environment of these latter words would be
> apparent even to one suffering from achromatopsia.
> The same phrase, "any impairment of physical
> condition," would be included in third degree assault,
> a misdemeanor, and without it there could be no
> assault that did not involve a grievous injury.[48]

It therefore held that "the words 'impairment of physical condition' simply

mean 'injury.'"[49]

In the intervening thirty-eight years, *Meredith*'s holding has come to be

more colloquially stated as "physical injury means *any* injury."[50]  Things as

minor as "a small wound not past the epidermis, with no blood loss,"[51] "pain in

---

[46] *Id.  See also* KRS 500.080(13).

[47] *Meredith*, 628 S.W.2d at 888.

[48] *Id.*

[49] *Id.*

[50] *See, e.g., Doneghy v. Commonwealth*, 410 S.W.3d 95, 111 (Ky. 2013); *Hubbard v. Commonwealth*, 932 S.W.2d 381, 383 (Ky. App. 1996); *Covington v. Commonwealth*, 849 S.W.2d 560, 564 (Ky. App. 1992) (emphasis added).

[51] *Doneghy*, 410 S.W.3d at 110.

[the] left hip,"[52] and "a bruised face and a scratch below [the] eye"[53] have all qualified as physical injuries under this definition. Exantus urges this Court to overturn our straightforward interpretation and replace it with a test that would determine whether a victim suffered a physical injury on a case-by-case basis, though he does not discuss how the term "any impairment of physical condition" could be interpreted differently. Regardless, we decline to overturn *Meredith*, as its holding remains sound.

The statutory definition of "physical injury" at issue is "*any* impairment of physical condition."[54] Our General Assembly speaks through statute, and this Court must always assume that the General Assembly means what it says and attempt to give effect to that meaning.[55] In this context, it said any impairment of physical condition, and it meant any impairment of physical condition, i.e. any injury. This conclusion is further bolstered by the fact that the General Assembly has not altered its definition of physical injury in the nearly four decades since this Court rendered *Meredith*. We accordingly decline Exantus' request to abandon that definition.

That said, K.T.'s injury clearly qualifies as a physical injury. K.T. testified that Exantus cut her nose with the butter knife. The defense presented no evidence to contradict that this occurred. It would therefore not

---

[52] *Hubbard*, 932 S.W.2d at 383.

[53] *Covington*, 849 S.W.2d at 564.

[54] KRS 500.080(13).

[55] *See, e.g.*, *Rice v. Commonwealth*, 492 S.W.3d 563, 564 (Ky. 2016).

21

have been clearly unreasonable for the jury to find that she suffered a physical injury.

Next, Exantus asserts that his directed verdict motion should have been granted because a butter knife is not a dangerous instrument. We disagree.

A dangerous instrument is "any instrument…article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury[.]"[56] Exantus argues that a butter knife cannot be a dangerous instrument because it is not readily capable of causing death or serious physical injury. But whether an object is a dangerous instrument typically has little to do with the object itself and more to do with how the object was used on a victim.

For example, in *Smith v. Commonwealth*, a carrot was used as a dangerous instrument.[57] The defendant was convicted of two counts of second-degree assault, and both counts required that the defendant intentionally caused physical injury to the victim by use of a dangerous instrument.[58] The defendant sexually assaulted his wife with a carrot in both her rectum and vagina, resulting in physical injury but not serious physical injury.[59] This Court affirmed the second-degree assault convictions.[60]

---

[56] KRS 500.080(3).

[57] 610 S.W.2d 602 (Ky. 1980).

[58] *Id.* at 604.

[59] *Id.* at 603-04.

[60] *Id.* 604.

In this case, a butter knife was used to cut K.T.'s nose, resulting in physical injury. Therefore, it would not have been unreasonable for the jury to find that the butter knife was "used, attempted to be used, or threatened to be used"[61] in a way that was readily capable of causing death or serious physical injury. The trial court accordingly did not abuse its discretion by failing to grant Exantus' motion for directed verdict for the second-degree assault of K.T.

### ii.) Second-degree assault of D.T.

Exantus also contends that the trial court erred by failing to grant his motion for directed verdict on the charge of second-degree assault against D.T. As with K.T., he argues that D.T.'s injury did not constitute a physical injury within the meaning of KRS 500.080(13).[62]

The Commonwealth concedes that this issue is preserved, but we disagree with that concession. Exantus' initial motion at the close of the Commonwealth's case-in-chief argued that D.T.'s injury was not a "physical injury." However, both his written and oral motions to renew his motion for directed verdict at the close of all the evidence were entirely silent as to the second-degree assault on D.T. If the defense presents evidence after the Commonwealth concludes its evidence,[63] failure to properly renew a motion for directed verdict at the close of all the evidence will render the issue

---

[61] KRS 500.080(3).

[62] Exantus also argues that the Commonwealth failed to prove that Exantus acted intentionally, and that the trial court failed to provide a jury instruction on "dangerous instrument." Again, because those arguments are addressed in Sections II(A) and II(D), respectively, we see no reason to address them here.

[63] *See Hampton v. Commonwealth*, 231 S.W.3d 740, 750 (Ky. 2007).

23

unpreserved.[64]  Exantus has not requested review of this issue for palpable

error under RCr 10.26.

Nonetheless, D.T.'s injury was a physical injury within the meaning of

the statute.  K.T. testified that the family went to the hospital after Exantus

was arrested.  She said that while they were at the hospital, D.T. told her that

"the man stabbed her."  A photograph introduced into evidence showed that

D.T. had a cut about an inch long and a half centimeter wide on her mid-back.

Based on the same reasoning applied in Section II(B)(i) of this opinion, this

injury met the statutory definition of a physical injury.

### iii.)  Fourth-degree assault of Dean

Last, Exantus argues that the trial court erred by failing to grant his

motion for directed verdict for the count of fourth-degree assault on Dean.

Exantus was convicted under the theory of fourth-degree assault that required

that he intentionally caused physical injury to Dean.[65]  Exantus alleges that

the Commonwealth failed to prove that he acted with intent, and therefore his

directed verdict motion should have been granted.

But, as with the directed verdict motion for the assault on D.T., this error

was not properly preserved for our review.  Exantus' written motion for directed

verdict at the close of the Commonwealth's evidence argued that the

Commonwealth failed to prove that Exantus acted intentionally with regard to

the fourth-degree assault on Dean.  However, both Exantus' written and oral

---

[64] *See, e.g., Baker v. Commonwealth*, 973 S.W.2d 54, 55 (Ky. 1998).

[65] KRS 508.030(1)(a).

motions for directed verdict at the close of all of the evidence were completely silent as to the count of fourth-degree assault. As previously stated, failure to properly renew a motion for directed verdict will render the issue unpreserved.[66] Exantus did not request that we review this issue for palpable error under RCr 10.26.

Nonetheless, we have already addressed the sufficiency of the mens rea evidence for the assault charges at length in Section II(A) of this opinion and held it was sufficient.

## C. The trial court did not abuse its discretion by declining to instruct the jury on fourth-degree assault against K.T. and D.T., respectively.

Exantus next asserts that the trial court erred by failing to instruct the jury on the lesser included offense of fourth-degree assault for the attacks on K.T. and D.T. These alleged errors were preserved by Exantus' tender of fourth-degree assault instructions in relation to both girls.[67]

We review a trial court's ruling regarding jury instructions for abuse of discretion.[68] A trial court abuses its discretion when it acts in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[69]

Trial judges have a statutory duty to instruct the jury on the whole law of the case,[70] i.e., any instruction inferable or supported to any extent by the

---

[66] *Baker*, 973 S.W.2d at 55.

[67] RCr 9.54(2).

[68] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

[69] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[70] RCr 9.54(1).

evidence presented at trial.[71] When ruling on whether it was error not to give a jury instruction, appellate courts must consider the evidence in a light most favorable to the party requesting the instruction.[72] Even so, a trial court does not have a duty to instruct on a lesser-included offense simply because a defendant requests it.[73] "[A]n instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser offense."[74] Therefore, the question this Court must answer is: in a light most favorable to Exantus, could the jury reasonably find Exantus not guilty of second-degree assault, but guilty of fourth-degree assault?

Exantus' tendered instructions on fourth degree assault were the same for both K.T. and D.T. In pertinent part, the tendered instructions required that the jury find that Exantus wantonly caused physical injury to them.[75] Conspicuously absent from this instruction is a required finding that Exantus caused physical injury to them with a dangerous instrument. Accordingly, under Exantus' proposed instruction, the jury would have to find that Exantus

---

[71] *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999).

[72] *Thomas v. Commonwealth*, 170 S.W.3d 343, 347 (Ky. 2005) (citing *Ruehl v. Houchin*, 387 S.W.2d 597, 599 (Ky. 1965)).

[73] *Swan v. Commonwealth*, 384 S.W.3d 77, 99 (Ky. 2012).

[74] *Id.* (quoting *Caudill v. Commonwealth*, 120 S.W.3d 635, 668 (Ky. 2003)).

[75] KRS 508.030(1)(a).

acted wantonly *and* that he caused physical injury to the girls without using a dangerous instrument.

While Exantus does at least claim that the jury could have found he caused K.T. and D.T.'s injuries without a dangerous instrument, he spends the majority of his argument supporting his contention that the jury could have found that he acted wantonly during the assaults. He asserts, correctly, that his mental state during the assaults was a question of fact for the jury to decide. But, even assuming arguendo that the jury could have found that he acted wantonly, that would not have been the end of its inquiry. It would also need to find beyond a reasonable doubt that Exantus inflicted the girls' injuries without the use of a dangerous instrument. Based on the evidence presented at trial, no reasonable juror could have made such a finding.

As previously stated, K.T. testified that Exantus cut her nose with a butter knife. K.T. also testified that later that night, when the family was at the hospital, D.T. told her that Exantus had "stabbed her," though it was unclear whether D.T. was cut with the butter knife used on K.T. or the butcher knife used on Logan. The defense conceded that Exantus committed the crimes he was charged with. It therefore presented no evidence whatsoever that Exantus somehow caused the girls injuries without use of a knife or knives.

We have already held in Section II(B)(i) of this opinion that the butter knife used to cut K.T.'s nose qualified as a dangerous instrument under the statutory definition of that term. By the same reasoning applied in that section, either of the knives that could have been used on D.T. would have

27

clearly qualified as a dangerous instrument.  Stated differently, whichever instrument was used to cut D.T. was "used, attempted to be used, or threatened to be used"[76] in a way that was readily capable of causing death or serious physical injury.

Consequently, no evidentiary basis existed upon which the jury could have had reasonable doubt that Exantus did not use a dangerous instrument to inflict the girls' physical injuries.  The jury therefore, could not have reasonably believed that Exantus was not guilty of second-degree assault yet believe beyond a reasonable doubt that he was guilty of fourth-degree assault.[77]  The trial court did not abuse its discretion, and we affirm.

## D. The trial court's failure to provide the jury with the definition of "dangerous instrument" was harmless error.

Exantus next alleges that his second-degree assault convictions must be reversed because the jury instructions did not define the term "dangerous instrument."  The Commonwealth argues that this issue was not properly preserved because Exantus did not verbally object during the trial court's discussion with the parties about the jury instructions.  However, we consider this issue to be preserved by Exantus' tendered instructions, which included a definition of "dangerous instrument."[78]

---

[76] KRS 500.080(3).

[77] *Swan*, 384 S.W.3d at 99.

[78] RCr 9.54(2).

28

Again, Exantus was convicted under the theory of second-degree assault provided for in KRS 508.020(1)(b). Under KRS 508.020(1)(b), a defendant is guilty of assault-second if he "intentionally causes physical injury to another person by means of a deadly weapon or a dangerous instrument." The instructions regarding the second-degree assault of K.T. read:

> You will find the Defendant guilty of Second Degree-Assault under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> a) That in Woodford County on or about December 7, 2015, and before the finding of the Indictment herein, he inflicted injury upon an 11-year-old female [K.T.] **with a knife, a dangerous instrument**; AND
>
> b) That in so doing, he intentionally caused physical injury to K.T.[79]

The instruction for the second-degree assault on D.T. was identical to the instruction for K.T.'s assault, except for of course their names and ages.

Thus, the jury could have found Exantus guilty of the second-degree assaults of K.T. and D.T. only if it believed that the knife used to injure them was a dangerous instrument. But, strangely, the "Definitions" instruction defined the term deadly weapon: "in the context of this case, any knife other than an ordinary pocket knife or hunting knife,"[80] but did not define the term dangerous instrument. Exantus argues it was reversable error for the trial court to fail to provide the jury with the definition of dangerous instrument.

---

[79] (emphasis added).

[80] KRS 500.080(4)(c).

Any error that a trial court commits in instructing the jury, including failing to define an element of an offense, is presumed to be prejudicial.[81] Nevertheless, such an error is subject to harmless error review.[82] "The test for harmless error is whether there is any substantial possibility that the outcome of the case would have been different without the presence of that error."[83] Stated differently, if this Court concludes beyond a reasonable doubt that a properly instructed jury would have reached the same verdict, the presumption is rebutted and the error is deemed harmless.[84] Therefore, the question before this Court is whether the jury would have found Exantus guilty but mentally ill of the two counts of second-degree assault if the trial court had provided the definition of dangerous instrument. We hold that it would have.

If the trial court had provided a definition of dangerous instrument that instruction would have stated that a dangerous instrument is "any instrument, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury[.]"[85]

With regard to K.T., the evidence was uncontroverted that Exantus cut her nose with a butter knife. We therefore believe beyond a reasonable doubt

---

[81] *See Commonwealth v. McCombs*, 304 S.W.3d 676,680 (Ky. 2009) (citing *Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008)).

[82] *See, e.g.*, *Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008).

[83] *Thacker v. Commonwealth*, 194 S.W.3d 287, 291 (Ky. 2006).

[84] *See McCombs*, 304 S.W.3d at 681 (citing *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

[85] KRS 500.080(3).

that, if the jury had been given the definition of dangerous instrument, its verdict would not have changed. More specifically, that the jury would have found that: (1) Exantus inflicted a physical injury on K.T. with a knife; and (2) that knife, under the circumstances in which it is used, attempted to be used, or threatened to be used, was readily capable of causing death or serious physical injury.

Likewise, with regard to D.T., the evidence was uncontroverted that Exantus "stabbed" her with either a butcher knife or a butter knife, resulting in a laceration on her mid-back. We therefore believe beyond a reasonable doubt that if the jury was provided the definition of dangerous instrument it would have found that Exantus was guilty of the second-degree assault on D.T. Specifically, regardless of whether the instrument was a butcher knife or butter knife, that: (1) Exantus inflicted a physical injury on D.T. with a knife; and (2) that knife, under the circumstances in which it is used, attempted to be used, or threatened to be used, was readily capable of causing death or serious physical injury.

There is simply no basis upon which to conclude that being provided with the definition of dangerous instrument would have somehow changed the jury's verdict, and Exantus has provided no argument to that effect. This is particularly true when considering that the defense conceded that Exantus committed all of the actus reus elements of these crimes and, in effect, the only issue for the jury to decide was whether he was legally insane when he

31

committed them. We therefore hold that the failure to instruct on the definition of dangerous instrument was harmless error.

### E. The trial court did not abuse its discretion by declining to strike Juror 5300 and Juror 5301 for cause.

Exantus asserts that the trial court erred by denying his motions to strike Jurors 5199, 5300, and 5301 for cause.

At the outset, we note that Exantus failed to properly preserve this issue with regard to Juror 5199. In order to preserve the alleged error that the trial court failed to strike a juror for cause, a defendant must do the following.[86] First, he must move the court to strike the juror for cause and be denied. Thereafter, he must exercise a peremptory strike on that juror and identify a different juror upon which he would have otherwise used that peremptory strike.[87] He must use all of his peremptory strikes, and, finally, the juror the defendant would have otherwise used his peremptory strike on must ultimately sit on the jury.[88]

Exantus moved to strike Juror 5199 for cause, but he did not exercise a peremptory strike on Juror 5199. The defense's peremptory strike sheet noted all of the jurors that it attempted to strike for cause by putting "(motion to strike denied)" next to those jurors' numbers. But, for whatever reason, this

---

[86] Because this trial occurred prior to this Court's recent holdings in *Floyd v. Neal*, 590 S.W.3d 245 (Ky. 2019) and *Ward v. Commonwealth*, 587 S.W.3d 312 (Ky. 2019), the holdings of those cases with regard to the preservation of a for cause strike issue do not apply to this case.

[87] *Gabbard v. Commonwealth*, 297 S.W.3d 844, 854 (Ky. 2009).

[88] *King v. Commonwealth*, 276 S.W.3d 270, 279 (Ky. 2009).

connotation was not next to juror 5199 even though the defense moved to strike him for cause. In addition, Juror 5199 was identified as one of the jurors the defense would have peremptorily struck if its motions to strike for cause had been granted. Exantus had a total of nine peremptory strikes.[89] He used five peremptory strikes on other jurors that he attempted to strike for cause and used the remaining four on jurors other than Juror 5199. We therefore hold that this issue is unpreserved, and because Exantus has not requested review for palpable error[90] we decline to address it.[91]

But, with regard to Jurors 5300 and 5301, Exantus did all that was required to preserve the issue of whether they should have been struck for cause. Notwithstanding, we hold that, with one exception, Exantus' arguments against Jurors 5300 and 5301 became moot when the jury found him not guilty by reason of insanity of murder and first-degree burglary.

As we have mentioned previously, this was originally a capital case. Therefore, the trial court conducted both general and individual voir dire. The focus of individual voir dire was to determine whether the jurors could consider the full range of possible penalties during the sentencing phase of trial, which by its nature included whether they could consider potential mitigation evidence.

---

[89] Exantus had the standard allotment of eight peremptory strikes under RCr 9.40(1), plus one additional strike under RCr 9.40(2) because the trial court sat two alternate jurors.

[90] *See* RCr 10.26.

[91] Juror 5199 sat on the jury but was removed as one of the two alternates before the jury's guilt phase deliberations.

Exantus argues that Juror 5300 should have been struck for cause for two reasons. First, because she could not consider the full range of available penalties, and second, because she could not consider mitigation evidence when deciding on a penalty.

Juror 5300's individual voir dire began by the trial court asking her if she could consider the full range of penalties, i.e. "twenty years in prison, the death penalty, and all the penalties between those two." Juror 5300 responded that she could consider them all. She also responded affirmatively when the trial court asked her if she would consider mitigating evidence before imposing a penalty. However, during defense counsel's questioning, the following exchange occurred:

> **Defense:** For someone, again, in that hypothetical situation: death of innocent victim during another felony, would you consider a term of years to where they would have a definite out date?
>
> **5300:** No.
>
> **Defense:** No? So under no circumstances could you give someone a twenty-year sentence who killed another human being and committed another serious felony?
>
> **5300:** No.
>
> **Defense:** Okay, and you're pretty confident. You didn't hesitate at all on that. You sound pretty sure. And there's nothing anyone could do to convince you otherwise of that?
>
> **5300:** No.
>
> **Defense:** Okay, and even if someone told you or tried to pressure you into changing your viewpoint on that,

34

you would not be able to consider a penalty of twenty years?

**5300:** No.

Exantus argues that these responses demonstrated that she could not properly consider the full range of penalties, notwithstanding her response to the contrary when questioned by the trial court. In addition, Exantus points to the following responses during the Commonwealth's questioning of Juror 5300 to support his argument that she could not properly consider mitigation evidence:

> **CW:** Now before you decide what the penalty is you might hear something called mitigation evidence. That might be evidence of the defendant's upbringing, maybe he had problems as a child, maybe he was a good employee at work, or maybe he had a drug issue. Is that the type of evidence you would like to hear before making a decision as to what the penalty should be?
>
> **5300:** No, because I feel like that's their past. Well, their past could have something to do with why they act out. So, yeah.
>
> **CW:** That's something you would at least want to hear and consider?
>
> **5300:** Yeah, I would take that into consideration.

Exantus next makes identical arguments with regard to Juror 5301: that she could not consider the full range of penalties or mitigation evidence. Exantus also makes a third argument with regard to Juror 5301, but as we do not feel that argument is moot, we will discuss it in more detail *infra*. Regarding the two issues at hand, when Juror 5301 was questioned by the trial court she said that she could consider the full range of possible penalties. When she was later questioned by defense counsel, two exchanges occurred,

35

which Exantus now points to in support of his arguments. The first concerned

mitigation evidence:

> **Defense:** The judge mentioned mitigating evidence as evidence that might lessen the penalty in a case and I wanted to go into that a little bit. If you were to hear that a defendant...had a drug or alcohol problem or was intoxicated at the time of the crime. Is that something that you think deserved a greater penalty or a lesser penalty.
>
> **5301:** That deserves equal if not more. Because they chose to do that.
>
> **Defense:** So if a defendant were to present evidence that they had a drug or alcohol problem or were intoxicated. That would either not change your thoughts on the penalty or it would increase the severity of the penalty?
>
> **5301:** It would not lessen it.
>
> **Defense:** So in that specific situation it wouldn't be something you would consider to lessen the penalty?
>
> **5301:** No.
>
> **Defense:** What about if the defendant was younger? Say eighteen years of age but still young. Is that something you would take into consideration when deciding on penalty?
>
> **5301:** No. They committed a crime, they deserve a punishment. Regardless of age.

The second exchange concerned possible penalties:

> **Defense:** I want to touch on mental illness and insanity briefly. Do you think it's fair that a defendant who is insane at the time they committed a crime can be found not guilty?
>
> **5301:** You would have to prove that first.

**Defense:** I guess what my question really is do you personally think it's fair?

**5301:** Even if the person is found to be insane, there still should be some punishment.

**Defense:** So if we were to show by a preponderance of the evidence that [Exantus] was insane, you still think there should be some punishment?

**5301:** Yes. A life has been lost.

**Defense:** So, based on that, could you really find him not guilty by reason of insanity? Knowing that there wouldn't be a jail punishment?

**5301:** No.

While this Court certainly agrees that some of Juror 5300 and 5301's responses were problematic, we cannot dispute the Commonwealth's contention that the issue of whether the trial court erred by failing to strike these jurors was rendered moot when the jury found Exantus not guilty by reason of insanity. We acknowledge that Exantus is correct in arguing that the Commonwealth did not cite any case law in support of its argument. But this Court's very recent case, *Mulazim v. Commonwealth*,[92] supports the Commonwealth's position, if only through dicta.

The co-defendants in *Mulazim* were charged with murder in the course of a robbery, a capital offense, and individual voir dire about possible penalties

---

[92] 600 S.W.3d 183 (Ky. 2020).

37

was accordingly held prior to trial.[93] However, the co-defendants were ultimately acquitted of murder, and convicted of other non-capital offenses.[94]

On appeal to this Court, the defendants in *Mulazim* alleged that the trial court erred by failing to strike five jurors for cause.[95] This Court noted first that it would only consider the defendants' arguments with regard to two of the jurors due to the amount of extra peremptory strikes they had received.[96] It then addressed the defendants' argument that two of the jurors should have been struck for cause.[97] The defendants argued, as Exantus does here, that the jurors should have been struck because they stated during their respective individual voir dires that they could not consider certain mitigating evidence.[98] The Court addressed these claims on the merits and held, based primarily on *Harris v. Commonwealth*,[99] that the trial court did not abuse its discretion in failing to strike either of them for cause.[100] In closing, the Court stated:

---

[93] *Id.* at 195.

[94] *Id.* at 188-89.

[95] *Id.* at 195.

[96] *Id.* at 197 ("[T]he trial court could have erroneously failed to exclude four (4) jurors for cause, and the Defendants would still have received everything they were entitled to under RCr 9.40. Essentially, the extra peremptory strikes granted by the trial court have the potential to insulate the result from reversal and in this case they did.").

[97] *Id.* at 198-200

[98] *Id.* at 198-200.

[99] 313 S.W.3d 40 (Ky. 2010) (holding that "a capital defendant is entitled to present mitigating evidence to the jury, [and] the jury must be allowed to give effect to that evidence if it is so inclined…There is no entitlement, however, to a jury or to individual jurors committed at the outset to view particular mitigating factors as having a mitigating effect.").

[100] *Mulazim*, 600 S.W.3d at 200.

> We reiterate that the trial court's and counsel's extensive inquiry into mitigators on individual voir dire only occurred because the case was tried as a capital offense due to the murder and robbery[.] Notably, **no convictions occurred on those offenses and consequently the jury never considered aggravated penalties, rendering Appellants' focus on the jurors' ability to consider mitigation evidence questionable at best**.[101]

Thus, although *Mulazim* does not directly address whether those issues were moot, it calls it into question. This Court now has the opportunity to address it directly.

"A case becomes moot as a result of a change in circumstances which vitiates the underlying vitality of the action. In such an action, a judgment when rendered, for any reason, cannot have any practical legal effect upon a *then* existing controversy."[102]

All of the responses Exantus complains of in the case at bar occurred in the context of individual voir dire commonly used in capital cases to "death qualify" prospective jurors.[103] Inquiries during this kind of voir dire are made solely in anticipation of one possible outcome: the jury finding the defendant guilty of a capital offense and thereafter considering the available range of sentences for a capital offense.[104] In this case, Exantus was found not guilty

---

[101] *Id.* at 200-01 (emphasis added).

[102] *Commonwealth v. Terrell*, 464 S.W.3d 495, 498–99 (Ky. 2015) (internal quotation marks and citations omitted).

[103] *See, e.g.*, *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986), *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).

[104] *See generally* KRS 532.025.

by reason of insanity of murder and the aggravating circumstance of first-degree burglary.[105] The jury therefore did not consider *any* sentences or mitigating evidence for those crimes. Accordingly, Exantus' argument that he was entitled to for cause strikes on Jurors 5300 and 5301 is based solely on their responses about deliberations that never took place. Meaning that if we were to reverse his conviction it would be based on prejudice that did not, and definitively could not, have occurred. We therefore hold that those arguments are moot.

We reiterate for clarity that these alleged errors were rendered moot solely by virtue of what occurred in this case. Specifically, Exantus argues his convictions must be reversed because of responses Jurors 5300 and 5301 gave during individual voir dire. Individual voir dire, for both jurors, focused solely on what sentences and mitigating factors those jurors could or could not consider if they found Exantus guilty of a capital offense. Ultimately, Exantus was not convicted of a capital offense. Had Exantus been convicted of a capital offense, his arguments regarding Jurors 5300 and 5301 would not be moot.

But, as we have previously mentioned, Exantus has asserted an argument in relation to Juror 5301 that is not moot. We will therefore address it on the merits. This Court reviews a trial court's decision not to strike a juror for cause for abuse of discretion.[106] A trial court abuses its discretion when it acts in a way that is arbitrary, unreasonable, unfair, or unsupported by sound

---

[105] KRS 532(2)(a)(2).

[106] *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007).

legal principles.[107] If a trial court abuses its discretion by failing to strike a juror for cause, it is reversible error.[108]

During group voir dire Juror 5301 informed the court that a friend of hers had been murdered during an attempted robbery while he was visiting his wife's grave. She explained that murder had occurred a year and a half ago, the perpetrator went to trial, and "justice was served." Both the court and defense counsel asked Juror 5301 if anything about her experience would influence the way she would decide the case, and she said twice, without hesitation, that it would not.

Exantus argues to this Court that this recent tragic event would have been in Juror 5301's mind throughout the trial, regardless of her statements to the contrary. This argument is not moot because Juror 5301's response was not during individual voir dire, and concerns, generally, how Juror 5301 would have considered the evidence of all the violent crimes in this case. In other words, while her personal experience involved a murder, that experience could also affect the way she viewed the evidence of the assaults, for which Exantus was not acquitted.

A trial court must remove a potential juror for cause when "there is reasonable ground to believe that a prospective juror cannot render a fair and

---

[107] *English*, 993 S.W.2d at 945.

[108] *Shane*, 243 S.W.3d at 341 (Ky. 2007).

impartial verdict on the evidence[.]"[109] This Court has expounded on this rule by stating that

> when there is uncertainty about whether a prospective juror should be stricken for cause, the prospective juror should be stricken. The trial court should err on the side of caution by striking the doubtful juror; that is, if a juror falls within a gray area, he should be stricken.[110]

In this case, Juror 5301's personal tragedy did not constitute reasonable grounds to believe that she could not render a fair and impartial verdict based on the evidence. As she indicated, the perpetrator was prosecuted, and she believed justice was served. There was accordingly no reason to suspect that she might seek displaced retribution on Exantus. In addition, there was no hesitation in her responses that her experience would not affect her deliberations. The trial court therefore did not abuse its discretion by failing to strike her for cause.

## F. The trial court erred by not making the requisite statutory findings under KRE[111] 703, but the error was harmless.

The final issue raised by Exantus is that the trial court erred by admitting evidence that, five years before the crimes in this case, Exantus violently shook his infant daughter from a previous marriage resulting in physical injury to her. This issue was properly preserved by Exantus' multiple

---

[109] RCr 9.36(1).

[110] *Ordway v. Commonwealth*, 391 S.W.3d 762, 780 (Ky. 2013).

[111] Kentucky Rule of Evidence.

42

objections to this evidence being admitted.[112]  This Court reviews trial court's ruling on the admissibility of evidence for abuse of discretion.[113]  A trial court abuses its discretion when it acts in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[114]

During the hearing on the motion to exclude this evidence the defense argued that it was prior bad act evidence and should be excluded under KRE 404(b).[115]  The Commonwealth responded that it should be allowed to use the evidence to challenge the basis of Dr. Benedict's opinion that Exantus was legally insane during the commission of his crimes.  The Commonwealth expounded that the concluding paragraph in Dr. Benedict's report states that "this appears to be a case whereby an individual with no known criminal or psychiatric history committed a murder[.]"  The Commonwealth asserted that this was demonstrably false information upon which Dr. Benedict based his finding of insanity because, although he was never charged, Exantus' act of harming his daughter was criminal conduct.  Therefore, it argued, it should be permitted to cross-examine Dr. Benedict about the information that formed the basis of his opinion.

The defense responded that "criminal history" meant criminal convictions and therefore the information in the report was not inaccurate.  And, further,

---

[112] RCr 9.22.

[113] *See Holt v. Commonwealth*, 250 S.W.3d 647, 652 (Ky. 2008).

[114] *English*, 993 S.W.2d at 945.

[115] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  KRE 404(b).

that the Commonwealth should not be permitted to back door KRE 404(b) evidence through an expert witness regardless of whether a defendant is ultimately convicted as a result of that prior bad act.

The trial court agreed that the evidence could not come in under KRE 404(b), but it agreed with the Commonwealth's argument that the instance was criminal conduct. It therefore ruled that the Commonwealth could cross-examine Dr. Benedict. Based on the trial court's review of the report, it seemed to the trial court that the fact that Exantus had no criminal history was important to Dr. Benedict in forming his opinion on insanity.

Later, during Dr. Benedict's direct examination, defense counsel had the following exchange with Dr. Benedict:

> **Defense:** In your report you state that Mr. Exantus appears to have no known criminal or psychiatric history. What do you mean by that?
>
> **Benedict:** I believe that comes from the summary of my report, and what I mean is that I'm aware at the time of writing it that he has no criminal convictions, no involvement in the juvenile justice system, and no contact with psychiatrists for either assessment or treatment of any potential disorders.
>
> **Defense:** You of course at that point knew Mr. Exantus smoked marijuana, right?
>
> **Benedict:** Yes, I was aware of that.
>
> **Defense:** Which is a criminal activity in some states.
>
> **Benedict:** Yes.
>
> **Defense:** But what you meant by criminal history was a charged offense.

44

**Benedict:** Right, I think what I said prior in the report was more accurate, I said there were no felony convictions or involvement in juvenile justice, so usually when I write there's no criminal history, I mean there's no criminal history of record.

**Defense:** And after you completed that report, did you have occasion to review additional evidence and documentation that pertains to Mr. Exantus and this case?

**Benedict:** I did.

**Defense:** In reviewing that information, did anything change regarding your opinion about the fact that Mr. Exantus has major mental illness or his ability to conform his conduct to the law?

**Benedict:** No. Nothing changed my opinion in that regard.

At this point in the examination defense counsel requested a side bench. It renewed its motion to exclude the instance of conduct with Exantus' daughter because it was now clear how Dr. Benedict defined criminal history and that the incident with Exantus' daughter did not change his opinion on the issue of insanity. The Commonwealth responded that it is still allowed to challenge the basis for his opinions and that the defense could not prevent that by asking such broad questions.

The trial court stated that it understood Dr. Benedict's definition of criminal history. But, regardless, saying that could lead the jury to believe that Exantus had never done anything criminal in nature before. The trial court found that the prior act of violent conduct was relevant and again ruled that the Commonwealth could cross-examine Dr. Benedict. The defense did not

request an admonition to the jury that the evidence should only be used "for the purpose of evaluating the validity and probative value of the expert's opinion[.]"[116]

After this ruling, the defense asked if Dr. Benedict was aware that Exantus shook one of his twin daughters as a baby resulting in physical injury to her. Dr. Benedict responded that he was aware of it, but it did not change his opinion.

The entirety of the Commonwealth's cross-examination on the subject went as follows:

> **CW:** Doctor...I read this to be your conclusion in your report...and I want to break that sentence down into a couple of elements. The first is that you describe the defendant as an individual with no known criminal history, don't you?
>
> **Benedict:** Yes.
>
> **CW:** Doctor, you know by now that the defendant caused physical injury to his infant daughter in February 2010 by shaking her, don't you?
>
> **Benedict:** I'm aware of that, it's my understanding that no criminal charges came from it, but I'm aware.
>
> **CW:** So if a person had been not charged or acquitted it would make no difference to you in a psychological workup?
>
> **Benedict:** I'm sorry, what's the question exactly?
>
> **CW:** Well, I guess the problem is you kind of sound like a lawyer. Either a person has committed acts of violence or they haven't. You're saying that to you

---

[116] KRE 703(b).

> even if they've admitted it, it doesn't matter if they weren't charged or weren't convicted.
>
> **Benedict:** No I think it's a relevant piece of information. He was having problems controlling his frustration and anger.
>
> **CW:** Well, doctor, that's the sentence in your report that states your opinion and you got it wrong regarding history of violence.
>
> **Benedict:** I think you have to understand the context in which I was writing this report. That statement was simply my saying I had no awareness of any criminal record, or that was my intended meaning. I'm not trying to emulate a lawyer, but I'm not aware that there was any prior criminal history. I think that statement still stands.
>
> **CW:** Okay, so the defendant didn't disclose to you that prior act?
>
> **Benedict:** No, sir.
>
> **CW:** Is it not part of your typical examination to ask that question?
>
> **Benedict:** I did.

Exantus now argues before this Court that the admission of this evidence was reversible error because it was prior bad act evidence under KRE 404(b) that was not otherwise admissible. KRE 404(b) directs that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The Commonwealth responds that it was properly admissible under KRE 703 to challenge the basis of Dr. Benedict's opinion. For the reasons that follow, we agree with the Commonwealth.

KRE 703 provides:

(a) The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data relied upon by an expert pursuant to subdivision (a) may at the discretion of the court be disclosed to the jury even though such facts or data are not admissible in evidence. Upon request the court shall admonish the jury to use such facts or data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

(c) Nothing in this rule is intended to limit the right of an opposing party to cross-examine an expert witness or to test the basis of an expert's opinion or inference.

Subsection (a), in relevant part, embodies the well-established rule that experts are permitted to base their opinions on facts and data that are not otherwise admissible in evidence, if they are of a type reasonably relied upon by other experts in their field. Stated differently, the facts and data that an expert relies upon in forming his or her opinion do not need to be admissible in order for the expert's opinion itself to be admissible. Subsection (b) provides that if an expert relied on otherwise inadmissible evidence in forming their opinion, that evidence can come in as a means to challenge the validity and probative value of that expert's opinion. However, that evidence may only be admitted if the trial court determines that the evidence was "trustworthy, necessary to

48

illuminate testimony, and unprivileged."[117]   Subsection (c) is self-explanatory:

nothing in KRE 703(a) or (b) is meant to limit the ability of an opposing party to

cross-examine or challenge the basis of an expert's opinion.

Though our case law regarding KRE 703 being invoked under these

circumstances is scarce, we have previously upheld a trial court's admission of

what would otherwise be KRE 404(b) evidence to explain the basis of an

expert's opinion.  In *Port v. Commonwealth*, the defendant was found guilty but

mentally ill of murder, attempted murder, and first-degree wanton

endangerment after walking into a diner and firing two shots resulting in the

death of one customer and the serious physical injury of another customer.[118]

At trial, the defendant asserted an insanity defense.[119]  The defense's

expert,  Dr. Deland, testified at trial that he believed the defendant was

"suffering from paranoid schizophrenia at the time of the incident" and that he

"lacked the substantial capacity to conform his conduct to the requirements of

the law."[120]  During cross-examination by the Commonwealth Dr. Deland

acknowledged that one of the things he relied on in forming his opinion was the

defendant's history.[121]  The Commonwealth then elicited testimony from Dr.

---

[117] *See also, Hoff v. Commonwealth*, 394 S.W.3d 368, 374 (Ky. 2011) ("KRE 703(b) does allow evidence not otherwise admissible to come in '[i]f determined to be trustworthy, necessary to illuminate testimony, and unprivileged,' to explain the basis of an expert's opinion.").

[118] 906 S.W.2d 327, 329 (Ky. 1995).

[119] *Id.* at 239-30.

[120] *Id.* at 330.

[121] *Id.* at 332.

Deland that "[a]t one point [the defendant] was accused of harassing his wife or ex-wife and a protection order had to be issued," and that, shortly before the shooting, the defendant was involved in "some kind of trouble down in Tennessee that was equally irrational but fortunately not as tragic."[122]

On appeal to this Court, the defendant argued that those two pieces of evidence were improperly admitted in violation of KRE 404(b).[123] We disagreed, and held:

> the testimony is directed at understanding the basis of the expert's opinion. The expert explicitly indicated that his assessment of the defendant's mental state at the time of the crime was based upon the defendant's past history. As a result, we do not find this testimony constitutes evidence of other crimes as anticipated under KRE [404(b)]: 'to show action in conformity therewith,' rather it was evidence being used to understand a medical diagnosis.[124]

It is therefore clear under both the Rule itself and *Port* that otherwise inadmissible evidence under KRE 404(b) is admissible to challenge the basis of an expert's opinion.

However, before otherwise inadmissible evidence can come in the trial court must determine that the evidence was "trustworthy, necessary to illuminate testimony, and not privileged." In *Rabovsky v. Commonwealth*, this Court held that it was error to allow an expert to read portions of otherwise inadmissible hospital records "without addressing the factual determinations

---

[122] *Id.*

[123] *Id.*

[124] *Id.*

required by KRE 703(b),"[125] though it should be noted that the *Rabovsky* Court

reversed the defendant's conviction on a different issue.[126]

Though it could be argued that the trial court in this case made the

requisite findings in an indirect manner,[127] we think strict adherence to KRE

703(b) is the better approach as it is the only safeguard provided in the rule

against the erroneous admission of otherwise inadmissible evidence.  More

specifically, when KRE 703 is compared to its federal counterpart, Fed. R. of

Evid.[128] 703, it is clear that KRE 703 tracks the language of Fed. R. Evid.

703.[129]  However, Fed. R. of Evid. 703 requires that otherwise inadmissible

evidence may only be admitted "if [its] probative value in helping the jury

evaluate the [Expert] opinion substantially outweighs [its] prejudicial effect."

This is a test that our General Assembly decided to forego when drafting KRE

703 and, instead, chose a less stringent test: that the evidence be determined

---

[125] 973 S.W.2d 6, 11 (Ky. 1998).

[126] *Id.* at 10. (holding that "[s]ince the results of the analyses of the blood samples were introduced without establishing the integrity of the samples by showing the chain of custody, the judgment of conviction must be reversed for a new trial.").

[127] The fact that the incident occurred was corroborated by Exantus himself and his ex-wife, the mother of the child, which would indicate trustworthiness.  The trial court admitted the evidence, in part, to clarify what Dr. Benedict meant by "no criminal history," which would indicate that it was necessary to illuminate testimony. And, the trial court found that it was not a privileged information between Exantus and his ex-wife because Exantus told his fiancé Lauren that it occurred.

[128] Federal Rule of Evidence.

[129] Fed. R. of Evid. 703 reads: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

by the trial court to be "trustworthy, necessary to illuminate testimony, and unprivileged." Though this test is a lower standard than that of the Federal Rule, it is still the only safeguard in KRE 703 against the erroneous admission of evidence and should therefore be strictly applied.

Therefore, because the trial court did not make the necessary findings under KRE 703(b), it did err. But we do not believe that error warrants reversal in this case. As we have previously indicated, using what would otherwise be inadmissible KRE 404(b) evidence to challenge the basis of an expert's opinion is permissible. Here, the Commonwealth used the incident with Exantus' daughter to challenge Dr. Benedict's conclusion that Exantus had no prior criminal history, which was a piece of information upon which Dr. Benedict based his opinion that Exantus was legally insane. Therefore, the cross-examination itself was permissible. More importantly, Exantus was found not guilty by reason of insanity of the capital offense of murder and the aggravating offense of first-degree burglary. And, he was found guilty but mentally ill of three assaults. It is therefore clear that the evidence at issue did not have an unduly prejudicial effect on the jury, and his convictions should stand.

We accordingly affirm but reiterate that trial courts should make the requisite factual findings under KRE 703(b) before admitting otherwise inadmissible evidence to challenge the basis of an expert's opinion.

## II.    CONCLUSION

Based on the foregoing, we affirm.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Karen Shuff Maurer
Roy A. Durham, II
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Thomas A. Van De Rostyne
Assistant Attorney General