**Leroy HAMPTON, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2006–SC–000122–MR.

Supreme Court of Kentucky.

Aug. 23, 2007.

As Modified Oct. 4, 2007.

Shannon Dupree, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, David W. Barr, Assistant Attorney General, Office of Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Leroy Hampton, was convicted of multiple drug charges, found to be a first-degree persistent felony offender (PFO), and was sentenced to twenty years in prison. On appeal, he argues that his conviction should be reversed because (1) the police improperly searched him and seized evidence from his person in violation of his Fourth Amendment rights, (2) he was entitled to a directed verdict as to the drug charges, and (3) his prosecution for possession of both a controlled substance and drug paraphernalia on which the controlled substance was found violated the constitutional proscription against double jeopardy. Finding no reversible error, Appellant's conviction is affirmed.

## I. Background

On April 30, 2005, Police Officer Erik Woodward received a tip around 4:00 a.m. of possible drug activity at a house in Bowling Green. Officer Woodward, along with Officer Jeff Eversoll and several other officers from the Bowling Green Police Department, proceeded to the home to investigate the tip. Officers Woodward and Eversoll parked a block from the residence and proceeded to the house on foot. At this time, eight to ten people came out of the house and began getting into their cars.

Appellant had just gotten into the rear passenger seat of one of the cars when Officer Eversoll walked up to it and opened the passenger-side door. He saw Appellant put something in his shoe, though he could not identify the object. Officer Eversoll ordered Appellant out of the car. After several minutes, Appellant consented to a search of his person, which led to the discovery of a pipe in Appellant's shoe. He was arrested and taken to jail.

At the jail, Appellant was asked if he had any contraband on his person, and answered that he did not. A subsequent search of Appellant revealed a second pipe in one of Appellant's pockets. Scientific tests of the two pipes indicated that both had cocaine residue on them.

Appellant was charged with first-degree possession of a controlled substance (second offense) for the cocaine residue on the pipes, first-degree promoting contraband for attempting to bring the second pipe with residue into the jail, possession of

drug paraphernalia, and being a first-degree persistent felony offender (PFO). At trial, he presented no evidence in his own defense, and was found guilty on all counts. The jury recommended ten years for the possession of a controlled substance charge (enhanced to twenty years for the PFO), five years for the contraband charge (also enhanced to twenty years for the PFO), and twelve months and a $500 fine for the possession of drug paraphernalia charge. The sentences were ordered to run concurrently for a total of twenty years. Appellant now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

### A. Suppression of the Cocaine and Pipe Evidence

Appellant first claims that the pipes should have been suppressed as the product of an illegal search and seizure. Specifically, he argues that the police had no reasonable, articulable suspicion that criminal activity was afoot, as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, when they had him get out of the car to be searched. He also argues that the officer's opening of the car door without first asking him to step out of the car exceeded his authority during the *Terry* stop. Finally, he claims that his consent to the search of his person was involuntary and coerced.

### 1. Reasonable and Articulable Suspicion

■■■ Officers must have a reasonable and articulable suspicion that a crime is occurring before they may perform a temporary investigative stop of a person on foot, *id.* at 21, 88 S.Ct. at 1879–80, or driving a car. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979). Whether the in-formation the police have is sufficient to give rise to such a suspicion is evaluated under the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 241–42, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983). Appellant claims the officers in this case had no such suspicion because the tip on which they relied in initially approaching the house was unreliable and uncorroborated, and because the additional evidence of people running from the house and prior reports of drug activity at the house were insufficient.

The tip that Appellant complains about came from a man riding a bike in the neighborhood. The man told the officers that drug activity was going on at a nearby house, though he did not say whether he had been inside it. He did not give an address, but he described the appearance of the house and its specific location in relation to a nearby intersection. The man did not describe Appellant, nor did he describe any of the vehicles at the house.

The officers did not know the name of the man, though they were familiar with him, having spoken with him previously and having received tips from him on several occasions. They also testified that they knew the man rode his bike at such an odd hour because he claimed to have insomnia. Officer Woodward testified that he had talked with the man on a regular basis and that he had given three to five tips that had proven reliable. Officer Eversoll, however, testified that he had not been able to follow-up on the man's tips in the past.

In light of this testimony, the trial court made specific factual findings about the tip:

> THE COURT FINDS that on April 30, 2005, Officer Woodward received a tip from a man with whom he was familiar and who had provided reliable infor-

mation regarding illegal activity on several occasions over the past year. The man, according to Officer Woodward's testimony[,] rides his bike at night because of insomnia and provided Officer Woodward on the night in question with a tip that drug activity was occurring at 741 East 11th Street. Based on this tip, Officers Woodward and Eversoll, as well as other police officers, approached the house within 15 minutes of receiving the tip.

■ Appellant complains that the "tip" was tantamount to one from an anonymous informant, and that it was unreliable because it was not corroborated, and therefore could not serve as the basis of a reasonable and articulable suspicion. A truly anonymous tip must bear some increased indicia of reliability such as independent verification before the police may rely on it. *See Florida v. J.L.*, 529 U.S. 266, 276, 120 S.Ct. 1375, 1381, 146 L.Ed.2d 254 (2000) (holding that anonymous tip corroborated only as to the readily observable location and appearance of a suspect was insufficient to give reasonable, articulable suspicion); *Alabama v. White*, 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990) (noting that corroboration of details in an anonymous informant's tip gave it sufficient indicia of reliability to support a reasonable, articulable suspicion); *Illinois v. Gates*, 462 U.S. 213, 241, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983) (noting that corroboration of details about future acts in an anonymous informant's tip made it reliable enough to support a finding of probable cause).

The anonymous tipster cases, however, are of limited applicability in this case. Though his name was unknown, the man who gave the tip to the police was not truly anonymous. The officers were familiar with him, having spoken with him on several previous occasions. One of the officers had previously received reliable tips from the man about criminal activity. Rather than being an anonymous tipster, whose information would need significant verification in order to support even a reasonable, articulable suspicion, the man on the bike was more akin to a citizen informant, whose tip inherently bears more indicia of reliability than that of a purely anonymous informant.

■ Citizen informants are tipsters who have face-to-face contact with the police or whose identity may be readily ascertained. Their tips "are generally competent to support a finding of reasonable suspicion (and in some cases, probable cause) whereas the same tip from a truly anonymous source would likely not have supported such a finding." *Commonwealth v. Kelly*, 180 S.W.3d 474, 478 (Ky.2005). In *Kelly*, the unnamed tipsters claimed to be employees of a local restaurant. They called in a report that a patron had just left the restaurant in a car and appeared to be intoxicated. They described the defendant and his car. When the officer arrived at the restaurant, two people who the officer assumed were employees of the restaurant were standing outside pointing across the street to a car that matched the description given on the phone. The officer followed the car to a nearby hotel parking lot and performed a *Terry* stop, which this Court upheld as the result of the tip from a citizen informant. Similarly, in *Commonwealth v. Priddy*, 184 S.W.3d 501 (Ky. 2005), this Court upheld an investigatory stop resulting from a tip from a man who flagged down a police officer on the street. The unnamed man described in detail a suspect and his truck, and stated that the suspect was about to engage in a drug deal in the parking lot of a local department store. The officer went to the parking lot and saw a truck and man matching the description given by the tipster. The offi-

cer performed an investigative stop that was upheld on appeal.

■ In both *Priddy* and *Kelly*, the tips were less corroborated than the anonymous ones in *Alabama v. White* and *Illinois v. Gates*. The investigative stops in those cases were nevertheless upheld because they were premised on tips from citizen informants whose information carried more indicia of reliability than those from purely anonymous sources, which was the case in *White* and *Gates*. While such citizen-informant tips are not always sufficient, given that the situation is evaluated under the totality of the circumstances, they are more likely to be so than anonymous tips (absent extensive corroboration).

When applied to this case, however, it is not as clear as in *Priddy* and *Kelly* that the informant's tip alone was sufficient. Like the tips in those cases, the man on the bike in this case described in some detail the nature of the alleged criminal activity, namely that several people were in the house buying or using drugs. Unlike those cases, however, the man did not even mention Appellant, much less describe him or his vehicle. And ultimately, nothing in the man's information connected Appellant to a crime. Thus, while the tip from the man on the bike enjoyed greater indicia of reliability as to its content than a purely anonymous tip, absent other information, its content alone would have been insufficient to allow police to perform an investigative stop of Appellant.

The police, however, had other information that justified their stop of Appellant when combined with the tip. The officers testified that they went to the house to perform a so-called "knock and talk," wherein they would knock on the front door of the house, ask some questions, and request consent to look in the house. They had received previous reports of drug activity at the house, so it was not unknown to them as a possible site of ongoing crime. In fact, the house had been the subject of some surveillance by the local Drug Task Force.

As the officers approached the house, eight to ten people left and got into their cars. Officer Eversoll testified that some of the people were walking and that others were running. Officer Woodward, however, testified that all the people were running and that all the people were hurrying. The trial court apparently believed the testimony of Officer Woodward because its findings of fact note, "As they approached, Officers Woodward and Eversoll observed 8–10 people *run out of the house* and into cars parked outside. This occurred at approximately 4:00 a.m." (Emphasis added.)

The trial court found in its order denying Appellant's suppression motion that this evidence considered together was sufficient to allow the officers to perform an investigatory stop:

> In this case, the investigative stop was initiated because [the police officers] observed 8–10 .people running from the house at 4:00 a.m., after [they] received a tip of drug activity at that house from a person who had previously provided reliable information. Furthermore, the officers had received, on previous occasions, information that drug activity had occurred at this house. Considering all of these factors, THE COURT FINDS that the officers have presented a reasonable, articulable suspicion of criminal activity justifying investigation. . . .

> Police officers, who had just received a tip, from a reliable source, that drug activity was occurring at a certain location and who then observed the occupants of the location fleeing the house at 4:00 a.m. as the police approached were justified to initiate the detention of the

defendant, one of the suspicious individuals, in order to investigate further.

█ The trial court is correct. Despite Appellant's protestations to the contrary, it is unusual for a large number of people to run out of a house to their cars at 4:00 a.m. Though unusual, such an event alone would not necessarily justify the officers' belief. But innocent behavior, combined with other circumstances, can "amount to reasonable suspicion.... Indeed, *Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.'" *United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968)); *see also Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam) ("[T]there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot.").

When the fleeing is combined with the somewhat reliable tip that drug activity was occurring at the house, along with previous reports of drug activity at the house and the fact that the fleeing occurred just as police began approaching, the situation takes on an entirely new—and suspicious—light. The convergence of those events gives rise to more than a nebulous and inchoate suspicion of criminal activity, and would lead a reasonable officer to conclude that the people had been involved in drug activity at the house and were then attempting to leave the scene of the crime. That Appellant was one of the fleeing people would justify the officers' belief that it was appropriate to investigate him, stopping him temporarily in the process. In light of the totality of the circumstances, it is clear that the officers had a reasonable and articulable suspicion that Appellant was engaged in criminal activity, thereby justifying a brief investigatory stop.

## 2. Opening the Car Door

█ Appellant also claims that even if an investigatory stop was justified, the officers' decision to open the car door before asking him to exit the car was impermissible. He does not challenge the officers' authority to require him to exit the car, as allowed in *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), at least if done for safety purposes. In support of his narrow contention, Appellant notes that officers are required to use the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). He argues that the act of opening the door was too much because the officers could have first asked him to step out of the car.

█ Appellant is correct that officers are required to use the least intrusive means. He fails to note, however, that "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case." *Id.* at 500, 103 S.Ct at 1325. Thus, while it may be that opening a car door without first asking the suspect to exit the car is inappropriate in some cases, it is not clear that such a wait-and-see approach is always the best method. That approach seems particularly ill-suited in a case like this one, where the suspect had just been seen running from a house suspected of accommodating drug sales and use and getting into the rear seat of a car whose door he now claims should have shielded him from the police. If Appellant was fleeing a drug den (which he was) with several officers approaching, then it would not be unreasonable to think he jumped in

the car in order to dispose of evidence of his crime or perhaps to get a weapon. Given the emphasis in investigatory stops on officer safety and the short time in which the events in question unfolded in this case, it was appropriate for the officers to open the car door to see what Appellant was doing and to have him step out.

Given the circumstances, opening the car door is not so different from the practice of ordering drivers to step out of their cars during short investigatory stops. As the Supreme Court noted in *Mimms:*

> [T]his additional intrusion can only be described as *de minimis*. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a serious intrusion upon the sanctity of the person, but it hardly rises to the level of a petty indignity. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

434 U.S. at 111, 98 S.Ct at 333 (internal citation and quotation marks omitted). Appellant admits that it would have been acceptable for the officers to converse with and observe him through an open window of the car or to have him exit it. Opening the car door exposed little more of Appellant than would have been visible through an open window, and certainly less than him standing outside the car. It is not a serious intrusion on the sanctity of his person, nor even "a petty indignity" or inconvenience. In light of the circumstances, the police did not exceed their lawful authority.

### 3. Voluntariness of the Consent to Search

■ Appellant also claims that his consent to the search of his person was involuntary and coerced because he was in pain from the handcuffs at the time. He testified that he had previously fallen and hurt his back, and that he was on his way to the hospital when the officers stopped him. He also claimed to have a bad knee. He testified that he was in pain and that Officer Eversoll refused to uncuff him unless he consented to a search. He also claimed that he thought the search would consist only of a pat-down and therefore would not reveal the crack pipe hidden in his shoe.

Officer Eversoll testified differently. He claimed that when Appellant exited the car, he became argumentative and belligerent. Only after a few minutes of this behavior were the handcuffs employed to give the officer time to identify Appellant. After a few questions, Officer Eversoll became concerned for his own safety and that of others, thus he left the cuffs on Appellant and continued to detain him. Officer Eversoll admitted that he had to ask Appellant for consent to search several times before it was given.

The trial court found in its order denying the suppression motion that:

> Officer Eversoll opened the door on the passenger side of the vehicle in which the defendant was located and observed the defendant placing something in his shoe that the officer could not identify. He, therefore, asked the defendant to step out of the car and began talking to him. The defendant became belligerent and argumentative, and would not identify himself for the police officers. He also cursed them. Officer Eversoll, therefore, handcuffed the defendant in order to secure the safety of the officers and other persons

at the scene. After being handcuffed, the defendant consented to a search, and Officer Eversoll found a pipe containing cocaine residue in the defendant's shoe.

. . .

The defendant also complains that there was not sufficient reason to handcuff him, which he claims resulted in compelling him to give consent. The stop, however, was reasonable, and the police officers then had a right to identify him and search him for weapons in order to secure the safety of all persons involved. The police, however, testified that the defendant was belligerent, argumentative and refused to cooperate to any extent. Therefore, THE COURT FINDS that it was prudent for the officer to handcuff him in order to maintain order. Furthermore, the Court DOES NOT FIND coercion from the testimony. The Court does not believe that the defendant was ever told that the handcuffs would be removed in exchange for consent to search. THE COURT FINDS that the officers did not, in fact, promise the defendant anything.... THIS COURT BELIEVES AND FINDS, from observing the witnesses' testimony, that Officer Eversoll's testimony that he believed the handcuffs were necessary for safety is credible. Furthermore, when the defendant complained that his shoulder and knee hurt, Officer Eversoll allowed him to sit to relieve the knee pain. The handcuffs did have their intended effect of calming the defendant, who then, according to his own testimony, consented to the search, believing Officer Eversoll would not find the crack pipe. This was a voluntary, studied decision made without coercion by the police.

The trial court specifically found Appellant's claims of coercion and a deal to undo the handcuffs were unbelievable and that his consent to the search was voluntary.

■■■■■ While it is fundamental that a consent must be free, voluntary, and without coercion, it is also the case that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). Questions of fact are subject to review only for clear error, the most deferential standard of review. *Miller v. Eldridge,* 146 S.W.3d 909, 915 (Ky.2004). The trial court's findings were based squarely in the evidence presented at the suppression hearing. While the court was ultimately required to choose between various competing and inconsistent versions of the events, that does not undermine the decision. In fact, that is the essential function of the trial court as the trier of fact when presented with preliminary questions such as whether consent was voluntarily given. Thus, the trial court's finding that Appellant's consent to search was voluntary was not clearly erroneous. Moreover, Appellant's consent did not limit the scope of the search to that of a pat-down, thus the fact that the police also searched in his shoe was not improper.

■■■■ The trial court also ruled that consent was unnecessary for the search because it was part of the investigatory stop. Appellant claims this too was error. While the search incident to an investigatory stop is usually limited to a superficial, unintrusive pat-down of the outer clothing for obvious signs of weapons—part of the classic "stop and frisk"—the scope of such a search is not always so limited. As noted above, "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each

case." *Royer*, 460 U.S. at 500, 103 S.Ct at 1325. When an officer sees a suspect stow an object in an item of clothing, such as a shoe, where it could not be revealed by a mere pat-down, a broader search may be allowed if concern about safety is sufficiently high. The trial court specifically found that the item the officers observed Appellant hiding in his shoe was unidentifiable and could have been a weapon (specifically a knife). In such a situation, it is not unreasonable for the officer to slightly expand the scope of the pat-down to include reaching into the shoe to determine the nature of the object hidden there.

## II. Directed Verdict

■ Appellant claims he was entitled to a directed verdict of acquittal on the possession of a controlled substance, promoting contraband, and drug paraphernalia charges. Before addressing the merits of those claims, however, it is necessary to first determine whether they were preserved for appellate review.

■ Appellant notes that he made a directed verdict motion at the end of the Commonwealth's proof, declined to put on any proof of his own, and then failed to renew his motion for a directed verdict. He claims this means that the issue is only partially preserved and thus must be addressed, if at all, under RCr 10.26, the palpable error rule. Despite his borderline concession, the fact that he put on no proof of his own means that the motion at the end of the Commonwealth's proof was sufficient to preserve the error for review. The preservation rule is simple: "A defendant must renew his motion for a directed verdict, thus allowing the trial court the opportunity to pass on the issue in light of all the evidence, in order to be preserved for our review." *Baker v. Commonwealth*, 973 S.W.2d 54, 55 (Ky.1998). Since the directed verdict motion was not followed

by more evidence, it did not need to be renewed because there was nothing new for the trial court to consider in evaluating it. *See also Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky.2003) ("[A] motion for directed verdict made after the close of the Commonwealth's case-in-chief, but not renewed at the close of all evidence—i.e., after the defense presents its evidence (*if it does so*) or after the Commonwealth's rebuttal evidence—is insufficient to preserve an error based upon insufficiency of the evidence." (emphasis added)).

■ As for the merits of Appellant's claim, the test of a denial or grant of a directed verdict on appeal is clear: "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991).

■ Appellant argues that the evidence of his possession of a controlled substance was insufficient because it constituted only a residue, which he argues is less than "any quantity" as required by KRS 218A.1415. Appellant's proposed construction of the statute has been expressly rejected by this Court in *Commonwealth v. Shively*, 814 S.W.2d 572, 573 (Ky.1991), and *Bolen v. Commonwealth*, 31 S.W.3d 907, 909–10 (Ky.2000), both of which held that the "any amount" language in the applicable controlled substance statute applied to residue on a pipe. Therefore, because there was evidence that the residue on the pipes found in Appellant's possession was cocaine, the motion for a directed verdict on the controlled-substance possession charge was properly denied.

■ Appellant also claims that he was entitled to a directed verdict on the

contraband charge. When taken to the jail, he was asked whether he had anything on him, to which he replied in the negative. The second pipe, also with cocaine residue, was found in his pocket at that time. A conviction for promoting contraband requires that a defendant "knowingly introduce[ ] dangerous contraband into a detention facility or penitentiary...." KRS 520.050. Appellant argues that there was no evidence that he knowingly possessed the second pipe when he went to the jail. "Circumstantial evidence is sufficient to support a criminal conviction as long as the evidence taken as a whole shows that it was not clearly unreasonable for the jury to find guilt." *Bussell v. Commonwealth,* 882 S.W.2d 111, 114 (Ky.1994). That Appellant knew he had the pipe when he went into the jail is a reasonable inference from the fact that it was in his own pocket. That he knew the pipe had cocaine on it was also a reasonable inference. Thus, the directed verdict was properly denied as to the contraband charge.

■■■ Appellant also claims that he was entitled to a directed verdict on the drug paraphernalia charge. He claims that the Commonwealth presented no evidence that he "intended to use" the pipe to consume drugs, KRS 218A.500(2), or that the pipe itself was "intended for use ... in ingesting, inhaling, or otherwise introducing into the human body a controlled substance," KRS 218A.500(1), since there was no direct evidence or significant circumstantial evidence, such as a separate quantity of cocaine, of such intent. However, the fact that the pipes had cocaine residue on them showed they had been used to consume drugs in the past and were therefore not innocent, common items. This supports a reasonable inference that the pipes were intended to be used illegally in the future. The fact that Appellant possessed the pipes also suggests that he intended to use

them in that manner. See KRS 218A.510(5) (noting that the "existence of any residue of controlled substances on the object" is a factor supporting a finding that the object is drug paraphernalia). The evidence was sufficient to support the conviction and the directed verdict was properly denied.

### III. Double Jeopardy

■■■ Finally, Appellant claims that his prosecution and conviction for both possession of a controlled substance and possession of drug paraphernalia violated his double jeopardy rights. Appellant argues that possession of a controlled substance for possessing the residue of cocaine on the pipes was an included offense of possession of drug paraphernalia in this case because one of the factors in considering whether the pipes were drug paraphernalia was whether there was "any residue of controlled substances" on them. KRS 218A.510(5).

It is true some drug-related offenses merge into others, thus preventing multiple convictions. *See Johnson v. Commonwealth,* 134 S.W.3d 563 (Ky.2004) (holding that defendant could not be convicted for both possession and manufacturing the same quantity of methamphetamine because manufacturing necessarily included a certain period of actual possession). That principle does not apply in this case because the elements of possession of a controlled substance are not contained in possession of drug paraphernalia, and vice versa. The elements of possession of drug paraphernalia are possession of an object that is drug paraphernalia with the intent to use it to consume drugs. Possession of a controlled substance requires knowing and unlawful possession of a controlled substance.

Appellant's theory only works if possession of a controlled substance (in the form

of cocaine residue on the alleged paraphernalia) is an element of the offense of possession of drug paraphernalia. It is not. The presence of residue is merely one of a nonexclusive list of factors found in KRS 218A.510 to be considered in determining whether a given object is drug paraphernalia. While such residue on the pipes is particularly compelling evidence that they were drug paraphernalia, the Commonwealth was not required to prove this fact to secure a conviction for possession of paraphernalia. Other evidence, whether of one of the other factors listed in KRS 218A.510 or any "other logically relevant factors," could have been presented and would have been sufficient to prove the paraphernalia element of the crime.

The fact that proof of the presence of cocaine residue was the basis of the possession of a controlled substance conviction, constituting one of the crucial elements of that offense, does not change this. A single item of evidence may be used to support proof of multiple crimes so long as each crime has an element that the other does not. Because the crimes in this case had separate elements, and in fact had no common elements, Appellant's convictions do not violate double jeopardy.

For the foregoing reasons, the judgment of the Warren Circuit Court is affirmed.

All sitting.

LAMBERT, C.J.; CUNNINGHAM, MINTON, NOBLE, SCHRODER and SCOTT, JJ., concur.