RENDERED: AUGUST 23, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0518-MR

ANTONIO WINN                      APPELLANT

v.            APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 22-CR-00609-001

COMMONWEALTH OF KENTUCKY           APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ECKERLE, A. JONES, AND TAYLOR, JUDGES.

ECKERLE, JUDGE: Pursuant to a conditional guilty plea, Appellant, Antonio Winn ("Winn"), appeals the denial of his motion to suppress evidence of his criminal activity, which led to charges involving narcotics, a firearm, a struggle with police, and persistent felony offenses. For the reasons stated below, we affirm the Trial Court's decision to allow consideration of the evidence.

## I. Relevant Factual and Procedural History

The facts underlying the limited issues before us do not appear to be disputed. These facts were developed in detail at the suppression hearing that the Trial Court held in November of 2022. Officer Christian D'Aniello (D'Aniello") served as the lone witness at the hearing.

D'Aniello testified that while on patrol, he saw the vehicle in which Winn was a passenger make a "short stay" at a home which D'Aniello knew had been used to traffic narcotics. D'Aniello saw Winn and the driver exit the vehicle. He then circled around the block and did not observe whether they entered the home. Soon thereafter, D'Aniello saw the vehicle pull out of the home's location, proceed to a nearby grocery store, and park. D'Aniello testified that in his training and experience, this type of short stay was indicative of drug trafficking. After driving past the vehicle once more, D'Aniello checked the vehicle's license plate, and the results indicated that he should stop the vehicle to verify insurance.[1]

D'Aniello testified that he next observed the vehicle going the wrong direction down a one-way street. According to him, although he had not actually seen the car leave the lot, there were only limited exits from that area, and the location where he next viewed the vehicle meant it could not have proceeded

---

[1] Kentucky Revised Statute ("KRS") 304.39-080 requires an owner to insure a vehicle, and a failure to carry insurance can result in a jail term of up to 90 days under KRS 304.99-060.

properly down that one-way street. Additionally, when he observed the vehicle, it was going above the speed limit and made a high-speed turn. D'Aniello conceded that he did not have radar in his cruiser to measure the exact speed, but, based on his training and experience, D'Aniello had seen enough to initiate a stop. Upon activating his lights, the vehicle stopped.

D'Aniello's bodycam was activated, and the stop was recorded by video and audio. D'Aniello testified that Winn attempted to exit the vehicle; however, Winn's attempted exit is not visible. Nonetheless, the audio depicts a somewhat garbled instruction by D'Aniello to Winn to remain in the vehicle.

Meanwhile, the driver, while hanging out of the car, told D'Aniello that the vehicle did not belong to her or to Winn. She indicated that she had picked up the vehicle from some unidentified person and was merely dropping it off elsewhere. D'Aniello did not believe the driver's account to be credible and interpreted her story as bizarre, as she indicated that she neither knew the vehicle's owner nor the drop-off location. When D'Aniello asked her about going the wrong way down a one-way street, the driver claimed that she had not been paying attention and had not seen any street signs indicating the street was one-way only. She also readily admitted that she did not have a valid operator's license. Meanwhile, Winn provided a different account, protesting that they had only gone to the grocery store to get milk. D'Aniello noted there was milk in the vehicle.

D'Aniello noticed that, based on their demeanor and body language, the driver and Winn were each demonstrably nervous. He also believed that they had tried to evade him by speeding and traveling in the wrong direction away from him. D'Aniello and another officer requested, and received, identifying information from the driver and Winn.

As D'Aniello walked back to his cruiser to check on the identifying information, he requested a K-9, canine unit, to come to the scene to detect whether narcotics were present. Back in his cruiser, he checked the information given and discovered that Winn's information "didn't turn up anything." D'Aniello testified that in his experience, a lack of a criminal history under circumstances such as these indicates that the information given was inaccurate. He then returned to Winn for clarification. The audio is not entirely clear, but it appears as if Winn mentioned something about his Social Security Number having been transposed by prison authorities. D'Aniello testified that he wanted to verify that Winn had a valid driver's license because he was not going to allow the current driver to stay behind the wheel because she did not have a valid license.

The K-9 unit arrived during this time. D'Aniello then paused completing traffic tickets for the infractions and assisted in removing the driver and Winn from the vehicle. D'Aniello stood near the driver and Winn as the dog sniffed the exterior of the vehicle. Though not visible on the body camera footage,

-4-

the dog apparently alerted to the expected presence of drugs in the car, and the K-9 officer indicated as much to D'Aniello.

D'Aniello then attempted to arrest the driver and Winn, but Winn started struggling. Winn began reaching for what turned out to be a handgun in his pocket, yelling that the officers would have to kill him. D'Aniello attempted to deploy a taser gun against Winn, but Winn punched him in the face, causing him to taser himself. Officers eventually obtained control of Winn and arrested him for narcotics, gun, and other offenses.

When asked for the reasons behind calling for a K-9 unit so quickly, D'Aniello testified that it was due to a combination of factors. Those reasons included the short stay at the narcotics house, the traffic violations, the lack of a valid operator's license, the alleged attempted evasion, the occupants' heightened nervousness, the driver's story not making sense on its own, and the story also conflicting with Winn's version.

After the hearing, the Trial Court denied the motion to suppress, holding that the traffic stop was not impermissibly extended to allow the dog to arrive and sniff for narcotics. Winn ultimately pleaded guilty to amended charges, conditioned purportedly upon the agreement that Winn could appeal the

suppression ruling,[2] and the Trial Court sentenced him to serve a term of ten years in prison. This appeal followed.

## II. Analysis[3]

It was, and remains, undisputed that the initial traffic stop was permissible for many reasons. Winn's arguments center around his first contention that the stop was improperly extended and his second belief that there was insufficient evidence that the dog reliably alerted to the presence of drugs.

When reviewing a ruling on a motion to suppress, we review findings of fact under the deferential, clearly-erroneous standard. *Commonwealth v.*

---

[2] The guilty plea offer signed by Winn contains a handwritten notation that it is conditional, but the matters Winn may challenge on appeal are not specified. Similarly, the final judgment notes that Winn's guilty plea was conditional but does not specify what appellate rights Winn reserved. Kentucky Rule of Criminal Procedure ("RCr") 8.09 provides that "[w]ith the approval of the court a defendant may enter a conditional plea of guilty, reserving **in writing** the right, on appeal from the judgment, to review of the adverse determination of any specified trial or pretrial motion." (Emphasis added.) Our Supreme Court has "urge[d] the bench and bar of this Commonwealth to specify in the record in conditional guilty pleas the precise issues being reserved for appellate purposes. Such careful preservation should eliminate uncertainty, which would inure to the benefit of everyone involved." *Dickerson v. Commonwealth*, 278 S.W.3d 145, 149 (Ky. 2009). Here, though there is no written documentation of the issues Winn reserved the right to raise on appeal, the Trial Court orally discussed, albeit extremely briefly and vaguely, with Winn at the time he entered his plea the fact that he was reserving his right to appeal a ruling the Trial Court issued after an unspecified prior hearing. No party asked the Trial Court for clarification. The parties on appeal seem to agree that Winn reserved the right to challenge the denial of his motion to suppress. Thus, though better practice would certainly have been to expressly list in writing the appellate rights Winn was reserving, under these facts we may properly analyze the Trial Court's denial of Winn's motion to suppress.

[3] "We have considered the parties' extensive arguments and citations to authority but will discuss only the arguments and cited authorities we deem most pertinent, the remainder being without merit, irrelevant, or redundant." *Schell v. Young*, 640 S.W.3d 24, 29 (Ky. App. 2021).

*Clayborne*, 635 S.W.3d 818, 822 (Ky. 2021).  However, we review conclusions of law *de novo*.  *Id.*

Here, Winn does not challenge the detail or accuracy of the Trial Court's findings or D'Aniello's testimony as the lone witness.  Thus, absent dispute, "we assume the testimony from the suppression hearing is accurate and use the facts elicited during that testimony as the basis for our analysis.  We therefore progress to review de novo the motion to suppress as a matter of law." *Id.* at 824.

### A.  Extension of the Traffic Stop for a Criminal Investigation

Under Kentucky law, "[a]ttending to a traffic violation and conducting a criminal investigation are two separate purposes." *Id.*  A dog sniff is a criminal investigation.  *Id.* at 825.  A traffic stop may not be extended to wait for a canine unless there is "reasonable, articulable suspicion to conduct further criminal investigation." *Id.* at 824 (citations omitted).  If there is no reasonable, articulable suspicion, and "[i]f the traffic stop is prolonged beyond the time required for the purposes of the stop, the subsequent discovery of contraband is the product of an unconstitutional seizure." *Commonwealth v. Conner*, 636 S.W.3d 464, 473 (Ky. 2021).

Here, it is indisputable that D'Aniello ceased working on the traffic citation when the K-9 unit arrived.  The Commonwealth seems to concede as

much, and properly so as our Supreme Court has held that an officer who similarly abandoned working on traffic-related citations had "prolonged the stop by assisting in the sniff." *Clayborne*, 635 S.W.3d at 828.

But concluding that the traffic stop was lengthened does not automatically entitle Winn to relief. Instead, "when a stop is prolonged, subsequent seizures may still be proper if the officer had reasonable, articulable suspicion to shift to a criminal investigation." *Id.* at 829.

"Reasonable, articulable suspicion" is a much lower burden for the Commonwealth than that of "probable cause." "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Baltimore v. Commonwealth*, 119 S.W.3d 532, 539 (Ky. App. 2003) (internal quotation marks, footnotes and citations omitted). *See also Conner*, 636 S.W.3d at 477.

The United States Supreme Court has "consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct." *Navarette v. California*, 572 U.S. 393, 403, 134 S. Ct. 1683, 1691, 188 L. Ed. 2d 680 (2014) (internal quotation marks and citation omitted). *Accord Hampton v. Commonwealth*, 231 S.W.3d 740, 747 (Ky. 2007). In short, "[t]he standard for a

finding of a reasonable, articulable suspicion is relatively low." *Yopp v. Commonwealth*, 562 S.W.3d 290, 294 (Ky. App. 2018).

Here, the Commonwealth relies upon the following pertinent facts to support its assertion that D'Aniello had reasonable suspicion of further criminal activity when he paused the completion of the traffic citation to aid in the process of the canine search:

- D'Aniello saw the vehicle make a "short stay" at a home known to him to be involved in the selling of narcotics;

- D'Aniello saw both occupants exit the vehicle at that home (though he did not see them enter the home);

- D'Aniello believed the vehicle was trying to evade him based upon its travelling the wrong way down a one-way street, speeding (imprecisely given the lack of radar in the cruiser), taking a turn at a seemingly high rate of speed, and traveling in a generally indirect route;

- Winn attempted to exit the vehicle immediately after it was stopped by D'Aniello, which led him to believe that Winn was trying to get away from the vehicle and its contents;

- The driver claimed that she did not know who owned the vehicle, where she obtained it, or where she was taking it;

- Both the driver and Winn appeared to be nervous;

- The driver did not have a valid driver's license;

- The events occurred in a high crime area; and

- The personal, identifying information initially given by Winn "didn't turn up anything," which D'Aniello explained often meant that the information was false.[4]

We recognize that some of these factors are common and/or are not inherently suspicious in and of themselves. For example, D'Aniello conceded that it was not uncommon for drivers to speed or for persons to be nervous after being pulled over by the police. Indeed, our Supreme Court has recognized that "[h]eightened nervousness is common among drivers detained by a police officer for a traffic violation." *Moberly v. Commonwealth*, 551 S.W.3d 26, 32 (Ky. 2018). Moreover, the fact that these events occurred in an allegedly high crime area is not, by itself, suspicious since "[t]he fact is that many honest, decent, law-abiding citizens live in high-crime areas . . . ." *Id.*

However, we "should not view the factors relied upon by the police officer(s) to create reasonable suspicion in isolation but must consider all of the officer(s)['] observations and give due regard to inferences and deductions drawn by them from their experience and training." *Baltimore*, 119 S.W.3d at 539.

---

[4]  Indeed, Winn had a criminal history, which in this case ultimately resulted in charges against him of being a Persistent Felony Offender.

Thus, "[o]fficers may draw on their own experience and specialized training to make inferences from, and deductions about, the cumulative information available to them that might well elude an untrained person." *Bauder v. Commonwealth*, 299 S.W.3d 588, 592 (Ky. 2009). Therefore, here, the nervousness of the driver and Winn, and the location of these events, may be considered as part of the reasonable suspicion analysis. *Adkins v. Commonwealth*, 96 S.W.3d 779, 788 (Ky. 2003) ("Although nervousness alone is insufficient to give rise to reasonable suspicion, it is an important factor in the analysis."); *Commonwealth v. Marr*, 250 S.W.3d 624, 627 (Ky. 2008) ("The police are permitted to take into account their surroundings - and whether a particular location has a reputation for being a 'known drug' area -when forming a reasonable and articulable suspicion.").

Winn has offered nothing to dispute D'Aniello's testimony that he observed the vehicle in which Winn was a passenger make a "short stay" at a home known to be a location used to traffic in narcotics, *i.e.*, a high-crime area. D'Aniello observed Winn and the driver exit the vehicle at that location, and although he did not see them enter the home, he saw them shortly afterwards back in their car near the home's location. Those factors strongly weigh in favor of the Commonwealth.

Winn has also not contradicted D'Aniello's testimony that the driver was uncommonly nervous, did not have a valid license, and gave bizarre,

essentially incoherent and conflicting responses when asked about her travel history and future travel plans. It is highly unusual for drivers to be unable to answer readily such questions, or to explain how they came into possession of the vehicle that they are operating. Winn's protestation that they were only going to the store to get milk was not inherently implausible, but it explains neither the difference between his story and that of the driver nor the driver's inability to answer those basic questions. Likewise, it makes no account for, and indeed ignores, the incriminating, short stop at the known narcotics home prior to the stop at the store. And on top of those circumstances, Winn was also exhibiting unusual nervousness. Each and all of these factors, especially when combined, are further strong indicia that criminal activity was afoot.

Continuing, there was also evidence sufficient for D'Aniello to reasonably conclude that the vehicle's occupants were trying to evade him. First, the driver sped. Second, she went the wrong way down a one-way road. Third, she took a turn at a high rate of speed. Fourth, she took a route that D'Aniello described as indirect. Fifth, Winn attempted to leave the vehicle as soon as it was stopped, which D'Aniello interpreted as Winn trying to get away from the contents of the vehicle. An officer may conclude from training and experience that persons are being evasive even when their conduct is on its face innocent or at least "consistent with noncriminal activity . . . ." *Commonwealth v. Morgan*, 248

S.W.3d 538, 543 (Ky. 2008). Here, however, D'Aniello's uncontradicted testimony was that Winn's behavior was far from innocent and was consistent with criminal activity.

Finally, the personal identifying information initially given by Winn was undeniably incorrect. Whether Winn intentionally tried to mislead the officers is unclear, but D'Aniello explained that in his training and experience, persons had often given him false information when the personal identifying information they provided did not result in "turn[ing] up anything" in the computerized database he utilized. In sum, the undisputed facts here are sufficient to surmount the low bar necessary to demonstrate reasonable, articulable suspicion.

We need not engage in an exhaustive analysis of every opinion involving a dog sniff. We recognize that the Kentucky Supreme Court has ordered evidence to be suppressed in other cases because it concluded officers lacked reasonable suspicion to turn a traffic stop into a criminal investigation. However, we conclude that those superficially similar cases are distinguishable because the officers in those cases did not possess as much damning cumulative information demonstrating criminal activity as D'Aniello did here. *See, e.g.*, *Clayborne*, 635 S.W.3d at 830 (no reasonable suspicion based on an officer's "testimony that he saw someone at a car late at night who walked away upon seeing a police vehicle, that the car then began driving, that the driver had a suspended license, and that

both occupants had prior narcotics charges"); *Moberly*, 551 S.W.3d at 32 ("Officer Sorrell articulated nothing about Appellant's behaviors, individually or collectively, to connect him to criminal behavior beyond what may be ordinarily expected of a driver stopped for a traffic violation.  Heightened nervousness is common among drivers detained by a police officer for a traffic violation. Sweating is a symptom of nervousness in some people.  Sorrell saw no indication that Appellant was intoxicated or otherwise impaired.  Moreover, he was fully cooperative and coherent.  He made no 'furtive gestures' to indicate he was trying to hide anything.") (citation omitted); *Conner*, 636 S.W.3d at 477-80 (no reasonable suspicion based on officer's "knowledge of a tip that Conner had been dealing methamphetamine, his observation of Conner moving something in the backseat of the van, and his earlier traffic stop of Conner").

### B.  Sufficiency and Reliability of the Evidence of the Dog Alert

Winn argues that "D'Aniello said the dog 'alerted,' but he and the Commonwealth failed to provide any context or facts to support what that meant or whether the alert was reliable."  Appellant's Brief, p. 14.  Winn admits that these issues were not preserved before the Trial Court or noted as reserved in his conditional guilty plea. He thus requests that we review them for palpable error under RCr 10.26.

Our Supreme Court has delineated the issues that an appellate court may review pursuant to a conditional guilty plea. Specifically,

> we will consider issues on appeal from a conditional guilty plea only if those issues: (1) involve a claim that the indictment did not charge an offense or the sentence imposed by the trial court was manifestly infirm, or (2) the issues upon which appellate review are sought were expressly set forth in the conditional plea documents or in a colloquy with the trial court, or (3) if the issues upon which appellate review is sought were brought to the trial court's attention before the entry of the conditional guilty plea even if the issues are not specifically reiterated in the guilty plea documents or plea colloquy.

*Dickerson*, 278 S.W.3d at 149. None of those factors have been met here. Winn did not seek a hearing before the Trial Court on this issue, and thus we have no testimony or evidence about the drug dog's training or qualifications surrounding making alerts under these specific circumstances. We are a reviewing Court, and we cannot review that which has not been placed in the record as evidence. We are similarly unwilling to speculate as to the Trial Court's potential ruling had a hearing been conducted. Absent a record on this issue, we cannot conclude that any error occurred. Consequently, we reject the request to address these arguments on the merits.[5]

---

[5] We similarly declined to engage in a merits review of these nearly identical unpreserved issues in *Cisero v. Commonwealth*, No. 2023-CA-0549-MR, 2024 WL 2227021 (Ky. App. May 17, 2024). We cite this case for informational purposes only. Interestingly, appellate counsel here is the same as in that case and raises the same issues before us again.

-15-

### III. Conclusion

For the foregoing reasons, the Fayette Circuit Court's denial of suppression is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Steven J. Buck
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Ken W. Riggs
Assistant Attorney General
Frankfort, Kentucky