RENDERED:  JUNE 26, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0874-MR


JAKE ALAN RAY PRINCE                                                    APPELLANT


v.
APPEAL FROM GREENUP CIRCUIT COURT
HONORABLE BRIAN C. MCCLOUD, JUDGE
ACTION NO. 24-CR-00036


COMMONWEALTH OF KENTUCKY                                    APPELLEE



OPINION
AFFIRMING

** ** ** ** **

BEFORE:  EASTON, ECKERLE, AND McNEILL, JUDGES

ECKERLE, JUDGE:  Appellant, Jake Alan Ray Prince ("Prince"), seeks review of

the Greenup Circuit Court's Judgment issued June 12, 2025, after Prince entered a

conditional guilty plea to one count of possession of methamphetamine precursors.

The Circuit Court accepted the plea while allowing Prince to reserve for appellate

review its November 14, 2024, Order overruling his motion to suppress, in which

he contended that evidence leading to his arrest and eventual indictment resulted

from an unconstitutional, motor-vehicle checkpoint. Upon review of the record and relevant law, we find no error and affirm.

## I. Factual and Procedural History

On December 14, 2023, the Greenup County Sheriff's Office ("GCSO") established several motor-vehicle, safety checkpoints, including one on Kentucky State Route 1 ("SR-1") in the Crane Creek area of Greenup County beginning at approximately 7:30 p.m. About 15 minutes after setting up the checkpoint and after multiple vehicles came through it, deputies with the GCSO stopped Prince. Video Record ("V.R.") 11/14/24, at 2:07:30-33. While checking Prince's license, registration, and seatbelt, GCSO Deputy Dustin Charles ("Charles") asked Prince if he had anything illegal in his vehicle. V.R. at 2:07:34-48; *see also* Record ("R.") at 29. Prince stated that he had a "marijuana roach in the vehicle and said that was all he had." *Id.* Charles asked Prince to pull to the shoulder of SR-1 and then asked if he could search his vehicle, whereupon Prince consented to the search. V.R. at 2:07:50, 2:10:50-55.

Charles and Deputy Zach Clark ("Clark") conducted the search of Prince's vehicle and found the marijuana roach; they also discovered a bag containing Claritin-D (pseudoephedrine), lithium batteries, plastic tubing, and receipts for various other items indicative of the manufacturing of methamphetamine. V.R. at 2:07:49-2:08:30, 2:44:40-2:45:05. The deputies

arrested Prince for possession of marijuana and unlawful possession of methamphetamine precursors, 1st offense.  R. at 29-30.  After Charles advised Prince of his *Miranda*[1] rights, Prince admitted to Charles that he manufactured methamphetamine for his own use, but he claimed that he did not sell it.  V.R. at 2:08:30-53.

As deputies were searching Prince's vehicle, a confidential informant ("CI") came through the same checkpoint and told Clark that he had observed Prince "cooking" methamphetamine at his home and soliciting other individuals to purchase boxes of pseudoephedrine.  V.R. at 2:10:05-17, 2:45:15-2:46:55; R. at 25-26.  Based on the methamphetamine precursors found in Prince's car and the information from a credible CI, Clark obtained a search warrant for Prince's residence.  R. at 27-28.  GCSO deputies conducting the search inside and outside of Prince's residence found further evidence of methamphetamine manufacturing, including coffee filters, liquid drain cleaner, camp fuel, crystal drain opener, a measuring cup with white powder residue, green plastic tubing, and a burnt plastic bottle with a battery and residue.  V.R. at 2:09:07-42; R. at 33.  After locating the evidence at the residence and interviewing witnesses, the GCSO issued a post-arrest citation charging Prince with manufacturing methamphetamine, 1st offense.  R. at 31-33.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

On March 27, 2024, the Greenup County Grand Jury indicted Prince for one count of manufacturing methamphetamine, 1st offense, and possession of marijuana. R. at 4. Thereafter, Prince filed a motion to suppress the evidence stemming from the checkpoint, search, and subsequent arrest. R. at 84. On November 14, 2024, the Trial Court conducted a suppression hearing, during which Charles and Clark testified regarding the checkpoint stop and Prince's search and arrest.

Pursuant to Prince's motion, the Trial Court admitted into evidence the GCSO Policy and Standard Operating Procedures Manual's guidelines for establishing and conducting "traffic safety checkpoints." V.R. at 2:22; R. at 78-81. The guidelines define these checkpoints as "[a] preplanned, systematic stopping of vehicles to check motorists for impaired driving on alcohol and/or drugs, then compliance with other motor vehicle laws." R. at 78. The policy's declared intent is "to promote safety for motorists . . . and to provide a deterrent for those who violate the laws . . ." by utilizing checkpoints to enforce motor vehicle licensing and registration and prevent driving "under the influence of intoxicants." R. at 79. The guidelines also require GCSO supervisors to: (1) select the locations "based on considerations of safety and visibility," (2) "note the locations[,] approximate times and officer-in charge," and (3) issue "[m]edia announcements . . . periodically to inform the public that traffic safety checkpoints would be

established in the area." *Id.* Deputies participating in traffic-safety checkpoints "shall insure their arrival and departure times are logged" with the computer-aided dispatch ("CAD"). R. at 80.

Charles testified that the Sheriff was on the scene and that "more than likely" he or the chief deputy approved the checkpoint based on predetermined and published locations. V.R. at 2:16:30-2:18:07. He also testified that the checkpoint was "logged" with dispatch and documented in the CAD report, which was not available during the suppression hearing. V.R. at 2:23:40-2:24:55. During his testimony, Clark substantiated written evidence that the Sheriff had selected and posted locations for the checkpoints on the GCSO website, including various locations along SR-1. V.R. at 2:18-20; 2:42:32-42; R. 82, Commonwealth's Exhibit 1. Additionally, the Commonwealth supplied an undated media advertisement that the GCSO published in the local newspaper advising of the possibility of checkpoints. R. at 83.

Regarding the purpose of the checkpoint, Prince's counsel cross-examined both deputies, with Clark's testimony proceeding as follows:

> Counsel: Do you know why this particular location was picked?
>
> Clark: We, on random times, the Sheriff will start discussing early in the week and look at staffing and see when we have the availability to come and do checkpoints. We had started the night on Route 7, I

believe. And the decision was made by either the Sheriff or the chief deputy to go across 784 on to Route 1 and setup. No reason, just luck of the draw. We went to several different places. We try to cover as much of the county as we can just at random.

Counsel:    Do you know how long you were at these other checkpoints that day?

Clark:      I don't recall. I want to say the initial one at [Route] 7 and 784, three prong, I think we were there for a half hour or so.

Counsel:    And why was it determined to do these checkpoints that day?

Clark:      Just staffing, staffing met, and it was one of the times that we try to provide our guys with overtime when we can close to the holidays. It's a way to get it and for safety around the holidays. So, it's not uncommon. We'll do it three or four times a year. But there was no set reason other than that particular day just happened everything aligned.

Counsel:    So, the reason to do the checkpoints in part was to try to get the deputies some overtime?

Clark:      Well, it's to enforce safety laws. But, yeah, when we have the money and the availability, we do them at random times. Yes.

Counsel:    What sort of safety laws were you enforcing?

Clark:        Seatbelts, making sure the vehicles were registered, not having suspended driver's licenses, DUI.

Counsel:      Do you know how many of those traffic violations came across to you during these checkpoints that day?

Clark:        No, sir.  I don't.

V.R. at 2:49:30-2:50:55.

In response to similar cross-examination questions, Charles also testified that he, Clark, the Sheriff, and other deputies were present at the checkpoint, including one deputy who was tasked with performing field-sobriety tests.  V.R. at 2:16:20-25.  Shortly after Prince's arrest, the GCSO closed the checkpoint, since several deputies were then tasked with obtaining and executing the search warrant.

Based upon the testimony and evidence presented at the suppression hearing, the Trial Court denied Prince's motion.  V.R. at 2:57:57-2:58:30; R. at 88. Thereafter, Prince entered a guilty plea to the reduced charge of possession of methamphetamine precursors (from manufacturing methamphetamine); his plea was specifically conditioned on his ability to appeal the denial of his motion to suppress.  R. at 105.  The Trial Court sentenced Prince to five years to serve consecutively to a prior felony conviction.  R. at 105-08.

## II. Standard of Review

Our review of a Trial Court's ruling on a pretrial motion to suppress is twofold:

> First, we review the trial court's findings of fact under the clearly erroneous standard. Under this standard, the trial court's findings of fact will be conclusive if they are supported by substantial evidence. Second, we review *de novo* the trial court's application of the law to the facts.

*Hernandez v. Commonwealth*, 730 S.W.3d 923, 928 (Ky. 2026) (quoting *Rhoton v. Commonwealth*, 610 S.W.3d 273, 275-76 (Ky. 2020)). Moreover, in *Hernandez*, the Kentucky Supreme Court most recently elaborated on this standard, holding that:

> Substantial evidence is "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Commonwealth v. Jennings*, 490 S.W.3d 339, 346 (Ky. 2016) (quoting *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998)). In undertaking such a review, we are mindful "to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). A trial court's decision on a suppression motion is "based squarely [on] the evidence presented at the suppression hearing." *Hampton v. Commonwealth*, 231 S.W.3d 740, 749 (Ky. 2007). Such testimony does not require corroboration. As a reviewing Court, we will not substitute our view of the evidence for that of the trial court. *Payne v. Commonwealth*, 681 S.W.3d 1, 4 (Ky. 2023).

*Id.*

## III. Analysis

We now turn to Prince's claim that the Trial Court erred by declining to suppress the evidence obtained at the checkpoint and the additional evidence subsequently seized as the result of the search warrant executed upon his residence. First, Prince contends that the GCSO's primary purpose for the checkpoint was for general crime control, which state and federal caselaw has previously held insufficient to justify a checkpoint. Second, he argues that, even if we find that the GCSO had a sufficient purpose for erecting the checkpoint, that checkpoint failed to meet the standards established by caselaw and violated the GCSO's own written policy, making it unreasonable, and, thus, unconstitutional.

The Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution mandate that any warrantless search or seizure be reasonable. *Commonwealth v. Cox*, 491 S.W.3d 167, 169 (Ky. 2015). "[A] highway stop of motorists at a government-operated checkpoint effectuates a seizure for Fourth Amendment purposes." *Commonwealth v. Buchanon*, 122 S.W.3d 565, 568 (Ky. 2003). While individualized suspicion is not required for such a checkpoint stop to be reasonable, Courts must still balance "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.*

(quoting *Brown v. Texas*, 443 U.S. 47, 50-51, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357, 362 (1979)). In the context of a traffic checkpoint, the Courts recognize "limited circumstances" where this balance reasonably supports a stop, including to verify drivers' licenses, check vehicle registrations, and ensure the safety of motorists from impaired drivers. *Singleton v. Commonwealth*, 364 S.W.3d 97, 102 (Ky. 2012) (citing *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979) and *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990)).

Further, Kentucky Courts hold "that inherent in all constitutional checkpoints is constrained discretion of officers at the scene, and that the checkpoint be well established pursuant to some sort of systemic plan." *Buchanon*, 122 S.W.3d at 569. While the Kentucky Supreme Court has not mandated specific criteria, it has "suggest[ed] several non-exclusive factors courts may consider in determining the reasonableness of a particular roadblock." *Id.* at 570. These factors include that: (1) the location, time, and procedures governing the checkpoint are determined by supervisory law enforcement; (2) the law enforcement at the scene complies with the procedures established by their supervisors to ensure each motorist is treated "in exactly the same manner"; (3) the nature of the checkpoint is readily apparent; and (4) the length of the stops runs no

longer than necessary to "look for signs of intoxication or check for license and registration." *Id.* at 571.

Addressing the purpose of the checkpoint, Prince argues that the "G[CS]O provided no reason to believe that this checkpoint, at this location, and at this time, was related to any specific law enforcement purpose" but rather that it "had no real purpose—other than to give law enforcement overtime before the holidays." Appellant's Brief at 5, 9. He argues that the actual purpose of the GCSO checkpoint was general crime control, which has previously been held constitutionally impermissible. *Buchanon*, 122 S.W.3d at 570 (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000)). In *Buchanon*, where the officer's testimony was "that the purpose of the roadblock was 'to detect any violation of the law,'" and there was other evidence indicating "that the primary purpose of the roadblock was general crime control, or more specifically, the interdiction of illegal narcotics[,]" our Supreme Court held that "there is no need to perform the balancing test enumerated in *Brown*." *Id.*

However, unlike in *Buchanon*, the evidence presented at Prince's suppression hearing was that the checkpoint was indeed part of a systematic policy and plan to enforce traffic safety and prevent intoxicated driving. The availability of staffing driven by voluntary overtime prior to the holidays did not negate the GCSO's affirmative and declared purpose. Further, consistent with this purpose,

-11-

deputies on the scene testified that they were stopping vehicles to check tags, drivers' licenses, registrations and seatbelts, and to detect any motorists impaired by alcohol and/or drugs and, if detected, conduct field sobriety tests. Therefore, we discern no error in the Trial Court's finding that the checkpoint was established for the GCSO's legitimate interest in ensuring traffic safety.

Regarding the administration of the checkpoint, Prince argues that there was insufficient notation of its location and time and that the media advertisement produced by the GCSO was insufficiently proximate to the date of the checkpoint where he was stopped. Prince cites to this Court's unpublished opinion in *Commonwealth v. Crosby*, in which we noted that having a written, local, law-enforcement policy on checkpoints and providing advance notice to the media, while not mandatory, do offer "greater assurance" that a particular checkpoint was conducted properly. No. 2017-CA-000572-MR, 2018 WL 3193074 at *4 (Ky. App. 2018). Even if we viewed our prior, unpublished decision as persuasive authority and more than *dicta*, we find that the GCSO's implementation of this checkpoint would still meet the mark.

The GCSO had a detailed, written policy on its traffic safety checkpoints with which it complied. Evidenced by the notice that was available to the public on the GCSO's website, the location and times of checkpoints were predetermined by the Greenup County Sheriff and his supervisory staff. And,

although not mandatory, the GCSO's policy was to announce "periodically" to the media that it would be conducting such checkpoints. An example of such an announcement was tendered as evidence of substantial compliance with this guideline. Perhaps more significantly, the administration of the checkpoint met other indicia of reasonableness that our Courts require. GCSO deputies at the scene testified that they complied with the standard operating procedures by having supervisory officers present, reporting their location at the checkpoint via CAD, making the checkpoint readily apparent, and conducting a consistent evaluation of each vehicle and motorist passing through the checkpoint. Moreover, they described the manner in which Prince's stop was conducted according to these established procedures and related that only after Prince stated that he had marijuana did deputies ask to search his vehicle, to which Prince consented.

We also note that Prince's theory of the reasons that he was stopped has changed. In addition to the procedural concerns that he cites on appeal, his questioning of Charles and Clark at the hearing implied that they had ulterior motives for the traffic and safety checkpoint. Specifically, Prince suggested that the GCSO targeted him by choosing the location intentionally to fall between the retail location where Prince had made purchases of pseudoephedrine and his residence. He also pointed with suspicion to the coincidence of the CI stopping at the same checkpoint. However, Prince provided no evidence to the Trial Court

either before or after the hearing that the testimony of Charles and Clark was anything other than credible and reliable. *Benton v. Commonwealth*, 598 S.W.3d 102, 106 (Ky. App. 2020). And, as the Kentucky Supreme Court has held, "an officer's testimony provides sufficient evidence to meet the substantial evidence standard." *Cobb v. Commonwealth*, 509 S.W.3d 705, 708 (Ky. 2017).

The Trial Court's decision to deny the motion to suppress was based squarely upon the evidence presented at the suppression hearing and giving due weight to the testimony of the deputies. It was, therefore, not clearly erroneous. Moreover, balancing the objective factors established by caselaw, the checkpoint was reasonable and, thus, constitutionally permissible.

## IV. Conclusion

Finding no error, we affirm the Order denying the motion to suppress and the final Judgment of the Greenup Circuit Court.


ALL CONCUR.


BRIEF FOR APPELLANT:

Robert T. Renfroe
Greenup, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General
Frankfort, Kentucky

-14-